# HEIRS OF CLARK *v.* T. A. AND J. D. ELLIS.

### WILLS—COUNTY COURT—JURISDICTION.

Where a suit is begun by petition in a county court to contest the validity of a will, and to revoke letters testamentary, which is demurred to on the ground that the court has no jurisdiction: *Held*, that the demurrer was properly overruled.

### DEPOSITIONS—CERTIFICATE OF COMMISSIONER.

Where a commissioner is appointed by a county court to take the deposition of a witness out of the state, to interrogatories thereto annexed, and return the same in a sealed envelope to the clerk of said county court, and in pursuance of such authority the answer of the witness to each interrogatory is written immediately under it, and the deposition signed by the witness, and appended thereto is the certificate of the commissioner, reciting, among other facts, that "having read said commission, and having administered an oath to said witness that the answers given by him to the interrogatories and cross-interrogatories should be the truth, the whole truth, and nothing but the truth, the examination was proceeded with, and the answer of the witness to each question is written as given by him," and signed by said commissioner, and such certificate was objected to because the same did not conform to the requirements of section 815, nor to titles three, four, seven and eight, chapter nine of the Oregon Civil Code: *Held*, that section 809, title 6, chapter 9, civil code, only requires the commissioner to certify the deposition to the court, and that this is sufficiently done when he certifies that the following, or foregoing, or accompanying, is the examination of the witness, given upon his oath or affirmation, "by me duly administered, in answer to interrogatories hereto annexed to the commission, or as therein stated," and that it was error to suppress said deposition.

Syllabus.

### INSANITY—DELIRIUM—PRESUMPTION.

Where the evidence showed that the testator was old, infirm and afflicted with disease which caused him much suffering, and who, at times, and when under the influence of fever, was flighty and wandering in mind, his thoughts tossed about and distracted, his conversation wild and incoherent, his face flushed and fevered, and his actions in marked contrast to his ordinary behavior: *Held*, that such symptoms indicate delirium.

Delirium is a temporary derangement of the mind, and is always preceded or attended by a feverish and highly diseased state of the body. It may vary in intensity from slight wanderings of the mind to more violent mental derangement, and it may be accompanied, in a greater or less degree, with stupor or insensibility.

In such case the rule of law is that a continuing insanity is never to be presumed, where the malady with which the person was affected was in its nature temporary and occasional.

### TESTAMENTARY CAPACITY—BURDEN OF PROOF.

Testamentary capacity implies that the testator fully understands what he is doing, and how he is doing it. He must have mind and memory sufficiently sound to enable him to know and to understand the business in which he was engaged when he executed the will.

The unreasonableness of a testator's prejudice, the unfairness of his disposition of his property, his disregard of the claims of natural affection, are not of themselves alone sufficient to induce a court to repudiate his will. If he possessed testamentary capacity, and the will was the product of his own free agency, his right to dispose of his property as he pleases is as absolute and sacred as any other right which he possesses.

Where the evidence showed that prior to the execution of the will, the testator was subject to delirious states of mind, which were only occasional and temporary, and superinduced by fever upon a diseased body, but which, during the continuance of such delirious state of mind, visibly affected his mental powers: *Held*, that the evidence must show that these delirious states of mind existed at the time the will was executed, in order to affect its validity.

The presumption of law is always in favor of sanity, and the burden of proof lies on the contestants of the will, unless a previous state of habitual or permanent insanity has been shown, in which case the burden of proof is shifted.

The capacity of the testator is to be tested at the time of the execution of the will, and the evidence of the attesting witnesses, all other things being equal, are most to be relied on.

APPEAL from Union.

*W. Lair Hill*, for appellant.

*E. C. Bronaugh*, for respondent.

By the Court, LORD, C. J.:

This proceeding was originally commenced in the county court of Union county, by petition of respondents as the heirs-at-law of William Clark, deceased, against the appellants, to set aside the will of said Clark, and to revoke the probate thereof.

The grounds set forth in the petition are a want of testamentary capacity in the testator, and undue influence exercised over him by the said T. A. Ellis, and J. D. Ellis, his wife, appellants as aforesaid.

From the pleadings it appears, that on the 18th day of May, 1878, the said William Clark made his will, in which the said T. A. Ellis was named as executor, and the said J. D. Ellis was sole legatee and devisee. On the 28th day of May, 1878, the said William Clark died, and on the 8th day of June, 1878, the will was admitted to probate in the county court of Union county, without notice to respondents, and the said T. A. Ellis having qualified as executor, proceeded to administer upon said estate. On the 20th day of June, 1879, the respondents filed their petition to set aside said will and cancel the letters testamentary issued thereon. The said appellants, having been cited, appeared and demurred to the petition, on the ground that the court had no jurisdiction of the suit.

The county court overruled the demurrer, whereupon the appellants answered, and the cause being at issue, a trial was had, which resulted in a decree as prayed for in said petition. From this decree the appellants appealed to the circuit court of Union county, by which court the decree of the said county court was affirmed, and the appeal as to Appia Clark dismissed, she being found not to be the widow of William Clark, by reason of a divorce from him prior to his death.

From this decree of the circuit court an appeal has been taken to this court.

The chief objection made upon the argument of the demurrer was that the county court had no jurisdiction of the subject matter—that the jurisdiction to annul wills is not a matter pertaining to probate, and is not vested in the county court, either by the constitution or by statute—and that original jurisdiction of such causes belongs to the circuit court. In support of this, counsel have cited us to the case of *Brown* v. *Brown*, 7 Oregon, 285. That was a suit brought to quiet title to certain lands sold by the executors and trustees of Cyrus Olney, deceased. By his will, Olney had devised all his real estate to J. G. Hustler and H. S. Aiken, in trust: First, to pay all his debts, and second, to hold the residue in perpetuity for the benefit of the town of Astoria, etc., and the trustees were appointed executors without bond. The will was duly admitted to probate, and letters testamentary issued to the executors named in the will. For the purpose of paying the debts of Olney, the lands in dispute were sold. Several years afterwards, the heirs-at-law of Olney filed a petition in the county court to set aside said will and revoke the letters testamentary, etc., which resulted in a decree as prayed for. The heirs-at-law of Olney claimed to be the owners of the land sold by the executors for the payment of his debts, and in consequence of such claim the purchasers brought suit to quiet their title. One of the defenses was, that the will having been declared void by the county court, the sale of the land was thereby annulled. To this conclusion, that the sale of the land was thereby annulled as the effect of the decree of the county court declaring the will void, the court refused to give its consent, and declared the law to be otherwise; that the legal consequence of the decree of the probate court was not to annul the sale of the land made by the executors under the will before its validity was contested, and while it remained unannulled. The court say: "The probate court had exclusive jurisdiction of the subject

matter in regard to the probate of what purported to be the will of Cyrus Olney. It was duly proved to be his will before that court, and letters testamentary were issued thereon, and until these proceedings were annulled the validity of the will could not be collaterally drawn into question by any one, nor by any other court. Administration of the estate under it could be conducted and enforced as under any other will duly proved. Such being the case, all acts done in the due course of administration, while the will remained unannulled and the letters testamentary were unrevoked, must be held entirely valid."

The jurisdiction of the county court, in a proper proceeding to set aside wills and to revoke letters testamentary, is not questioned. On the contrary, it seems to us, from the facts before the court, and the language used in respect to those facts, such jurisdiction is, at least, impliedly admitted, for the court, in substance, decides that the effect of the decree of the county court in declaring the will void, cannot be to render invalid those acts of the executors done in the due course of administration, before the validity of the will was contested; and while it remained uncancelled, and the letters testamentary were unrevoked. By section twelve of article eight of state constitution, it is provided that the county courts shall have, among other things, the jurisdiction pertaining to probate courts. In pursuance of this provision, the legislature has enacted that the " county court has exclusive jurisdiction, in the first instance, pertaining to a court of probate : 1. To take proof of wills. 2. To grant and revoke letters testamentary of administration and guardianship," etc.

It has already been decided that the judgments and decrees of the county court are to be held conclusive in collateral proceedings, and in every instance, until they are vacated by proceedings on appeal, or successfully impeached. (*Jones* v. *Dore*, 6 Oregon, 188.)

In the case of *Hubbard* v. *Hubbard*, the grounds of contest, and the proceedings, were virtually the same as in the

case under consideration. The will was admitted to probate by the county court *ex parte*, and without notice, and subsequently its validity was contested in the same court, on the grounds of a want of testamentary capacity and undue influence. The court held that where a will had been probated by proceedings *ex parte*, as in this case, and the validity of the will is attacked by a direct proceeding, based on sufficient allegations, it is incumbent on those affirming the validity of the will to re-probate the same *de novo*, by original proof, in the same manner as if no probate thereof had been had, and that the burden of proof in every such proceeding lies upon the party propounding the will, as to every fact not waived or admitted by the pleadings. (7 Or., 43.)

The re-probate required when the validity of the will is attacked, the issue formed in every such proceeding of which the party propounding the will has the *onus probandi*, is a subject matter of the same jurisdiction as the probate of a will of which the county court has the exclusive jurisdiction in the first instance, under the statute above cited. In such a proceeding, if the evidence should satisfy the court that the will admitted to probate, and upon which letters testamentary had been issued by the court, was not the will of the testator, the authority of the court to declare such will void, and " to revoke the letters testamentary," cannot be questioned. In our opinion the demurrer was properly overruled.

The next objection is, that the court erred in suppressing the deposition of Dr. H. B. Drake. The deposition was taken by Robert A. Leggitt, clerk of Wayne county, Michigan, under a commission issued to him from the county court of Union county, Oregon. The commission appoints him a commissioner to examine Dr. H. B. Drake, a witness, and authorizes him at certain days, to be by him for that purpose appointed, to administer an oath to said witness, and to take the deposition of said witness, in answer to the interrogatories thereto annexed, and to have him, the said witness, sign, his deposition after the same has been

reduced to writing, and to sign the same himself, and certify the said deposition to the said county court, in a sealed envelope, directed to the clerk of said county court, of Union county. Immediately under each interrogatory, the answer to it is written, and the deposition is signed by the witness. The certificate is annexed to the deposition, and signed by the commissioner, and recites, among other facts, that, "having read said commission, and having administered an oath to said witness that the answers given by him to the interrogatories and cross-interrogatories should be the truth, the whole truth, and nothing but the truth, the examination was proceeded with, and the answer to each question is written as given by him." The objection is that the certificate of the commissioner does not conform to the requirements of section 815, nor to titles three, four, seven and eight, of chapter nine, Oregon civil code. A slight examination will make it apparent that neither this section, nor those titles of chapter nine of the code, are applicable in determining the sufficiency of a certificate to depositions taken out of the state, upon written interrogatories.

It is section 809 of title 6, chapter 9, of the Oregon civil code, which provides for the certificate to depositions taken out of the state. This section (809) only requires that the commissioner shall "certify the deposition to the court." And this, Judge Deady says, is sufficiently done when he certifies the following, or foregoing, or accompanying, is the examination of the witness given upon his oath, or affirmation, by me duly administered, in answer to the interrogatories annexed to the commission, or as therein stated. (*Keene* v. *Meade*, 3 Peters, 1.)

This certificate, appended to the examination, states that the witness "testified in the above case as found above; that is, in answer to the interrogatories annexed to the commission." (*Jones* v. *Oregon C. R. Co.*, 3 Sawyer, (U. S.) 528.)

This brings us to the consideration of the evidence.

It appears that the testator was about seventy years of age

at the time of his death; that he was married to his wife, Appia, in Gennessee county, New York, in 1829, and that subsequently they removed to Illinois; that eight children, all of whom are now living, were born of said marriage; that the testator left his home in Illinois in 1850, and went to California " to hunt gold," that up to this last date he had provided for his family; that for several years after his departure, he corresponded occasionally with his family, principally with his oldest daughter, Berinthia; that this correspondence ceased about the year 1860, in consequence, it seems, of a letter of his to Berinthia having been returned to him by her husband; that in 1857 his wife, Appia, procured a divorce in Scott county, Illinois; that in 1864 the testator met, in Salem, Oregon, S. T. Newhard, whose acquaintance he had previously made in Sacramento, California, in 1859; that they " bought provisions together, went to Eastern Oregon, and engaged as partners in business, keeping Hot Lake House, farming and raising stock;" that they have lived together—except a short time before his death—and continued to do business as partners, until his decease; that the testator had been sick some time prior to his death, growing worse in the spring of 1878; that about seven weeks before he died, he went to Ellis', and while there he made his will, by which he disinherited his children, and bequeathed and devised all his property, personal and real, to Mrs. J. D. Ellis, after the payment of his debts, and that about ten days after the execution of said will he died.

It appears from the testimony of Newhard, that during the winter and spring of 1878, the testator was in ill health, and badly afflicted with disease, which, at times, affected his mental powers.    He says, " his lungs were almost entirely gone, his liver was badly deranged, and he had an abscess on his leg, under his knee." He suffered, too, from rheumatism, which first manifested itself in the summer of 1867.    But in the winter and spring of 1878, his maladies grew worse, and his constitution rapidly gave way before the inroads of disease,

which, at times, and when under the influence of fever, or suffering from acute pain, visibly affected his powers of mind. It seems that about this time he insisted on taking a mud bath, which Newhard tried to prevail on him not to take on account of the weak state of his health. He persisted, and when Newhard fixed the bath for him, he refused to take it then. He did, however, take the bath while Newhard was out at his work, and on his return he told Newhard that he "got in the bath, and it was so hot that it came near burning him, and that he had to make three efforts before he could place himself on the slats."

From that time he became possessed of the notion that Newhard had "fixed a trap" in the bath to suffocate him. He would repeat it over and over again, to his friends and neighbors, when they called to see him. It was an unjust suspicion, and according to our view of the evidence, without any foundation in truth. There is no witness who believes it, and many of them, but without much success, undertake to disabuse his mind of its improbability and groundlessness. It is a suspicion, though, that one of his age, infirmities, and condition of health, under the peculiar circumstances of his situation, and when, according to the testimony of Slater, he complained of "Newhard being cross to him, and not waiting on him properly, said Newhard thought he was a burden to him and wanted to get rid of him; said Newhard would get rid of him, that he was going in a few days to the house of the best woman living—Mrs. Ellis," might be liable to entertain, without furnishing any proof of mental aberration, or a loss of understanding.

About this time, according to the testimony of Newhard, the change in the conduct, conversation and mental peculiarities of the testator became noticeable. He says he would talk silly with any person, and say, "If you see any one tell them Clark is crazy." Yet he must have been conscious of such conditions of his mind, although he may not have possessed the will-power at the time to control his "silly talk," for

Newhard says: " When I would come home in the evening, Clark would say, ' I have been talking like a crazy fool all day.' "

Several other witnesses testify to a similar state of facts. One says, " he talked right straight along, first about one thing and then about another." Another witness says, " he told me a lot of stuff, which he said he had never told anybody else. I got up to start, when he stopped me. He said he did not want anybody to talk when they called to see him, and he still kept on talking—told me if I saw any one on the way, tell them to call and see him; that he had a streak of talking on him, and that he wanted to talk—did not want them to do any of the talking, and to tell them he was crazy."

Another witness says, when he called to see him he was lying on the lounge, and he asked him if any doctor was attending him. He said, " damn the doctors," and burst out crying. At that moment a young man entered the house with a field glass swung over his shoulders, which Clark took for a " pill wallet" of a physician, and when told it was a field glass, he broke out crying again. In some of these conversations he declared it to be his intention to leave his property to " poor widows and orphans, less to the widows, as they might marry again and squander it."

It would seem from the evidence that there were times, or occasions, when he appeared to be in a sort of stupor, from which, when first aroused, his mental faculties were confused and clouded. Slater says: " I knocked at the front door and there was no response to my knocking. I opened the door and saw Mr. Clark lying on the bed. He seemed to be asleep. I spoke to him; he woke up, and did not know me; asked me what my name was. I told him, and he seemed to understand who I was."

The occasion referred to in the evidence of Newhard, when the testator told him he had been sleeping all day, and again the next evening that he had slept all day again, and that he had never done such a thing in his life before, were probably

the effect of stupor, originating in the condition of his health, from which, when aroused, or by a return of consciousness, he thought he had been asleep.

These are the most marked phases of the mental peculiarities of the testator which the evidence exhibits, and have been selected to show the nature of the facts and circumstances upon which his insanity has been predicated. There is, however, a good deal of testimony, both for the contestants and for the proponents of the will, that shows, in our judgment, that these states of mind are exceptional and temporary; that ordinarily he was rational, and in his conversations and conduct he exhibited that degree of sense and judgment which usually belongs to men of his age and intelligence. Besides, the symptoms manifested in his conduct and conversation, taken in connection with his age and sickness, in our opinion, only indicate light-headedness, or delirious states of mind, superinduced by fever; at such times his mind would necessarily be flighty and wandering, his thoughts tossed about and distracted, his conversation wild and incoherent.

It is true that the testimony of two or three of the witnesses indicate that his memory was failing, but this was to be expected in one of his age, and might be said of a multitude of old men, whose competency for any business is never questioned. During this time his business transactions were not numerous nor complicated, but the evidence shows that he was not neglectful of his affairs, and that he fully understood what property he had, and its value.

Newhard must have thought he was competent to do business, for he says: " When I was improving the house he wanted to pay his part of the improvements," which certainly shows, on the part of the testator, just and proper conceptions of his business relations and duty, and it was settled by note. Again, on another occasion, subsequently, he executed to the testator another note, and made some arrangement in the interest of Mr. Pratt, by which he rented for one year the testator's interest in the Hot Lake property.

Some stress was laid on the fact that the testator wanted to have a bond canceled, which evinced his want of ordinary business capacity, but the evidence shows that when the nature of the transaction was explained, he not only understood it, but was satisfied with the bond.    There is no doubt, from the evidence, that the testator was peevish, of irritable temper, impatient of contradiction, and at times, when his nervous system was unduly excited, from fever, or racked with pain, that he was delirious, or "out of his head."    Under such circumstances he would necessarily be, as testified to, garrulous and incoherent in his conversations, affected by spasms of crying, his bearing and conduct in striking contrast to his usual habits, his brain confused and clouded, and his volition and judgment temporarily suspended.    Some illustration may be found of this in the testimony of Mr. Goodall.    He says: "He was sitting in front of the door—seemed to be suffering, quite sick, his face was very much flushed, and apparently had a high fever."    In the conversation which ensued he betrayed similar manifestations, and talked very excitedly, and "I told him, finally, his fever was too high, and that he had better talk no more."    It never occurred to this witness, who knew him well, that the testator was an insane man, or habitually insane.    He attributed his excited conversation and behavior to the fever in his sick condition, for at other times, when he saw him afterwards, he says, "he appeared free from fever, and his conversations were reasonable."    This indicates, quite plainly, that these unusual manifestations of the testator, to which witnesses have testified, depended upon feverish states in his diseased condition, and that when his mind was flighty and wandering, or delirious, it was primarily due to this cause, which was occasional and temporary, and succeeded by a return to his normal condition of mind, in which he enjoyed his usual and ordinary vigor of understanding.    This, we think, is apparent from the testimony of several of the witnesses for the contestants.    In giving the result of the impressions that his looks, conduct and conversation produced

on their minds, it does not seem to us that they wish to be understood as intending to convey the idea or impression that he was permanently insane, or that the mental peculiarities which they observed were habitual.

"At times," says Newhard, "he would talk rather foolish, be sorry for it, burst into tears, and take a crying spell over it." Evidently implying there were other times when his mind was calm and in its normal condition—free from the exciting cause which produced these manifestations. "I could not answer the question as to his mental capacity," says witness McComas, "but I thought he talked very wild that day, for a business man, from what he had talked to me before. But I did not know the cause of this. There might have been something the matter with him I knew nothing of." Mr. McComas was unwilling to give the impression of insanity. He knew he talked differently from what he had before to him, but he evidently felt that it was due to some present cause in his sickness, which he knew nothing about, and which was of a temporary character. Another witness thought the mind of the testator was "liable at any time to drop into natural grooves, and seem perfectly rational." Another witness, who thought his mind was weak and confused, considered "he was perfectly at himself part of the time."

These selections, taken from the foremost witnesses for the contestants, are certainly not calculated to impress the mind with the conviction of permanent insanity. At most, the aberrations to which they refer are not habitual, and the character of them, taken in connection with all the facts, and his state of bodily health, make it evident that at times he was delirious from fever, and talked wildly and at random.

The opportunities of several of the witnesses for observing the habits and mental peculiarities of the testator were too limited to entitle any opinion they might express to much consideration. Some only saw him once, and then only for a short time, and others express an opinion on a state of facts upon which it would be unsafe to rely.

"Casual observers," says Mr. Redfield, "those but slightly acquainted with the person, are liable to very great misapprehension in regard to the capacity of aged persons. To a correct estimate upon the subject, it seems to be requisite that one should not only possess general skill and experience upon the question, but that he should either have had long and familiar acquaintance with the particular person, or at least ample opportunity to observe the precise state of the mental powers."

If this be true of aged persons, of whom the testator was one, it certainly applies with much force to the circumstances of his case. In the view thus far taken we have purposely excluded from consideration, with but one exception, the testimony of the proponents of the will. But this view is not inconsistent with the facts upon which their witnesses, the majority of whom were friends and intimate acquaintances of the testator, express the opinion of his sanity. The facts and circumstances which they relate only confirm our opinion that the whole testimony, taken together during this period, shows about this state of facts: That the testator was old, infirm, afflicted with disease, which caused him much suffering, and which, at times and when intensified by fever, deranged his nervous system and produced temporary delirium. That the mental aberrations which the testator exhibited was the product of his disease, intensified by fever, which, at such times, clouded his intellectual faculties, and deprived him of mental control and direction.

Mr. Redfield, in his valuable work, says: "The delirium of disease very closely resembles ordinary insanity, so that the patient, when in fever, is often supposed to be insane, and as such has often been removed to the hospital for the insane." It is not strange, then, that some of the witnesses, when they heard the incoherent talk of the testator, and observed his excited behavior, should have thought he was insane.

On this same subject, Chancellor Bland says: "What is commonly called delirium is always preceded or attended by

a feverish and highly diseased state of the body.    His thoughts
seem to drift about—wildering and tossing amidst distracted
dreams.    And his observations, when he makes any, as often
happens, are wild and incoherent."   (1 Bland Ch., 370.)

These delirious states of mind in the testator, were indicated
by his spasms of crying, his incoherent talk, his flushed face
and fevered look, his excited behavior, and marked change in
his habits and mental peculiarities.    But the evidence shows
that these manifestations were not continuous and permanent,
but occasional and temporary, dependent upon the rise and
fall of his physical health, and his freedom from fever and
suffering.

In such cases the rule of law is, that a continuing insanity
is never to be presumed, where the malady with which the
testator was affected was in its nature occasional and tem-
porary.

On the 8th day of April, 1878, the testator left his own
residence at Hot Lake House, and went to reside at the house
of Ellis, a neighbor acquaintance, for the purpose, as it ap-
pears, of being nursed and cared for.    It was not possible,
living alone as he and Newhard did, at their home, for New-
hard to give him the care and attention his sick condition
required.    He did, undoubtedly, the best he could under the
circumstances, but the business in which they were engaged
necessarily required him to be absent at work during the day,
and the testator was too sick to be left alone, as he often was.
The testator, of his own accord, went to Ellis', because, as he
said himself, he thought Mrs. Ellis was a good nurse, and he
would be better provided for, and more comfortable than it
was possible to be at his own residence.    He remained at
Ellis' until he died, which was about the period of seven
weeks.    He executed his will on the 18th day of May, 1878,
and died on the 28th day of May, 1878.    During the time he
was there, Newhard visited him about once a week, and Mr.
Dick two or three times during this period, and these are the
only witnesses (neither of whom was present on the day the

will was executed) whose testimony indicates that at the times when they saw him his mind was unsound. On the other hand, Mrs. Peebler and Mrs. Green, witnesses for the contestants, who saw and conversed with him, express an entirely opposite opinion, and think " he was in his right mind." Mr. Goodall visited him two or three times while at Ellis', and on one occasion for the purpose of buying from him some barley, and the conversation and circumstances which he details, show that he was rational, and talked and behaved with sense and judgment. Mr. T. A. Wallace saw him and conversed with him, as also did C. S. Kahler and Mrs. Mary Wallace, and the impression which his conduct and conversation produced on their minds was that the testator was sane, and " in his right mind." The facts and circumstances which they relate of his bearing and conversation, are susceptible of no other conclusion. Mr. Ellis, the executor, and Mrs. Ellis, the devisee of the will, express the same opinion. There is no doubt, from the evidence, that the testator was more comfortable at Ellis', in less pain and more free from fever. Mr. Goodall noticed this. He says: " Each time I saw him at Ellis' he appeared free from fever," and the result was, as the evidence shows, that his conversations were " reasonable," and he displayed that sagacity and judgment which belong to men of his age, ntielligence and condition in life. That there was one or two occasions, while at Ellis', when his mind was flighty and wandering, and he exhibited manifestations similar to what was testified to when at Hot Lake, is doubtless true. Banton testifies to a conversation he had with Mr. and Mrs. Ellis, in which Ellis said that " Clark got on a wild tantrum spell the other night." This circumstance, as related by Mrs. Ellis, in her testimony, of his refusal to sleep in his bed-room; his coming out upon his crutches into the sitting room, and sitting down on the lounge; of his angry and impatient conduct when they tried to persuade him to return; of his sliding off the lounge on the floor, and the arrangements they had to make for him to sleep there, to pacify him, indicates a fever-

ish state, when his nerves were jarring and his mind flighty, and without much mental control. Nor does there seem to be any disposition on the part of these witnesses to avoid this conclusion. The language of Mr. Ellis indicates what he thought, and the facts in respect to such circumstance are stated in the testimony of Mrs. Ellis. But that this was exceptional, and not his ordinary condition, is made again evident by her testimony. She says: " When not overdone and nervous, as sometimes at night he was, he was clear, wonderfully so, for one of his age, and sick as he was."

It is proper to notice here, that none of the witnesses to whose testimony we have referred, were present at the execution of the will, nor saw the testator that day, with the exception of Mr. and Mrs. Ellis. The will was written by Robert Eakin, an attorney-at-law, and at the request of the testator. Mr. Eakin testifies that about the 11th day of May, 1878, Dr. Drake notified him that the testator wanted to see him at the residence of Mr. Ellis, for the purpose of making a disposition of his property; that, in response, he went and saw the testator, and was then employed by him to draw the will. That the testator told him he wished to will his property to Mrs. Ellis, and gave him the details in reference to the disposition of the interest he owned in the property, and where he could find a description of the real estate, as he could not recollect it. Mr. Eakin asked him in reference to his family, and he said that they had no claim upon him, and he did not wish them to have his property. When Mr. Eakin asked him if he knew they must be mentioned in the will in order to make it valid as against them, he said he did not, and remarked, " you know best;". and, " if that is the case, mention them in the will;" that he wished the will to be drawn right, so that they could get none of his property.

Certainly no one can examine the testimony of Mr. Eakin and reach any other conclusion than that the testator was, at this time, rational and understood what he was doing. All

the statements of the interview are candidly told, and are consistent with the transaction.

A good deal of stress was laid on the fact that he disinherited his children, but this is consistent with his manifest intention when his mental powers were not questioned. A will which he had made some time before excluded them from its benefits, and gave his property to a nephew, which, it seems, he destroyed. Subsequently, while at Hot Lake House, it is in evidence that he repeatedly declared it to be his intention to leave his property to the " poor widows and orphans."

He had been separated from his family for over a quarter of a century. His wife had obtained a divorce, in 1857. He had corresponded with his daughter until about 1860, when his letter was returned under circumstances of insult, and the sting of filial unkindness undoubtedly still rankled in his bosom, and all his acts and declarations, so far as the evidence shows, manifest a deliberate intention to exclude them from his bounty. But the unreasonableness of his prejudices, or the unfairness of his disposition of his property, or his disregard of the claims of natural affection, are not of themselves alone sufficient to induce a court to repudiate his will.

If he possessed testamentary capacity, and the will was the product of his own free agency, the right to dispose of his property by will as he pleases, is as sacred and absolute under the law as any other right.

On the 18th day of May, 1878, the will was executed by the testator. The subscribing witnesses are Dr. H. B. Drake, his physician, and Miss Lillie Blackslee, a young lady twenty-two years of age, and in the employment of Mrs. Ellis. Dr. Drake testifies that the testator requested him, and also Miss Blackslee, to sign the will as witnesses; that during the months of April and May, in the capacity of his physician, he visited him once or twice each week; that the testator was afflicted with tuberculosis of the lungs, which affected his lungs and liver. That " he was mentally sound whenever I saw him; " that he was clear and rational on the 18th day of May, 1878,

when the will was executed; that he considered him sound mentally, and particularly clear on all business matters; that at the time the will was executed he was very weak and confined in bed; that he desired him to witness the execution of the will, because he knew his mental condition, and could testify to the same; and that the testator said at that time that he desired Mrs. Ellis to have the property as he had willed it.

Miss Blackslee testifies that she went to Ellis' about the 5th or 7th of May, 1878, and that she saw him daily while she was there; that she signed the will at the request of the testator with Dr. Drake; that she did not see the testator sign the will, but that Dr. Drake asked him if that was his signature, and he replied that it was; that the will was lying on the table at his bedside when she signed it, and that the testator saw her sign it; that she signed and immediately left the room, but thinks Dr. Drake went out of the room before she signed it; and that he was of sound mind.

The evidence of this witness shows that she had ample opportunity to observe the mental condition of the testator for ten or twelve days prior to the execution of the will. She was there for the purpose of " helping Mrs. Ellis in the house work and care of the old gentleman," and the impression which his conduct and conversation produced on her mind was, that the testator was of sound mind during that time and at the execution of the will.

The testator died ten days after the execution of the will, on the 28th of May, 1878, and four days before he died, and during these last four days, Mr. Pratt took care of him, and he says, " he was in his right mind part of the time, and part of the time he was not;" but that on the day he died " he wanted me to give him a gun to shoot himself with, and he wanted me to give him a razor to cut his throat with; did not want me to change the hot rocks in the bed; said they were burning him when they were cold, and from these facts I did not consider him of sound mind." He was evidently delirious, and in a high state of fever on the day of his death.

It only remains to ascertain the law and apply it to the facts of this case.   In *Daniel* v. *Daniel*, 39 Penn. St. R., it is said that " testamentary capacity implies that the testator fully understands what he is doing, and how he is doing it; he must know his property and how he wishes to dispose of it among those entitled to his bounty.   If he understands, in detail, what he is doing, and chooses with understanding and reason between one disposition and another, it is sufficient."

In *Home* v. *Home*, 9 Iredell, 99, with reference to the amount of testamentary capacity necessary, it is said it is sufficient if the testator knew what he was doing, and to whom he was giving his property; and in 1 Redfield on Wills, 125, 127, it is said that this is about as accurate and brief a definition as can be given.

In *Kinne* v. *Kinne*, 9 Conn., 104, the court say:   " Had he an understanding of the nature of the business he was engaged in, a recollection of the property he meant to dispose of, and of the persons to whom he meant to convey it, and the manner he meant to distribute it between them? "

In *Stevens* v. *Vancleve*, 4 Wash. C. C. R., Washington, J., said: " To sum up the whole in the most simple and intelligent form, were his mind and memory sufficiently sound to enable him to know and to understand the business in which he was engaged at the time he executed the will? "

The point of time, then, to be considered at which the capacity of the testator is to be tested, is the time when the will was executed.   This is the important epoch.   And Judge Washington says: " The evidence of the attesting witnesses, and next to them, of those who were present at the execution, all other things being equal, are most to be relied upon."

In the case before us, none other than the attesting witnesses were present at the execution, and they have testified to the soundness of his mind at that time.   The evidence of the attorney who drew the will according to his instructions, and the positive and uncontradicted testimony of the subscribing witnesses to the will, of the soundness of the testator's

mind at the time the will was executed, establish beyond doubt that the testator was rational, and did know and understand what he was doing at the time the will was executed. As was said in the case of *Lee's Heirs* v. *Lee's Executor*, " There was so much deliberation and thought in all this, that even if the testator had been before afflicted with habitual insanity, yet this conduct was sufficient to establish a complete intermission." (4 McCord, 123.)

The facts in that case were much stronger than those in the case under consideration, and even if it be conceded that the manifestations the testator exhibited while at Hot Lake House, show habitual insanity, the evidence is conclusive that they were less frequent while at Ellis', and did not exist when he instructed his will to be drawn, and when he executed it. There is no testimony of the contestants which reaches this point, and in the absence of such, and the uncontradicted testimony of the subscribing witnesses of the testator's soundness of mind at the time the will was executed, we are of the opinion that the testator knew and understood the business in which he was engaged at the time he executed his will, and that such will was the product of his own free agency.

The decree of the court below is reversed.