Argued 29 January; decided 17 February, 1902.

## AMES' WILL.

### AMES v. AMES.

[67 Pac. 737.]

40  495
40  585
40  495
f 47  313

WILL—NECESSITY OF REQUESTING WITNESS TO SIGN.*

1. A person who has seen a testator sign a will and then signs as a witness thereto signs "at the request" of the testator if the latter understands what is being done and apparently assents thereto.

APPOINTMENT OF GUARDIAN AS EVIDENCE OF MENTAL INCAPACITY.

2. The appointment of a guardian for a person alleged to be mentally incompetent is presumptive evidence that the person under guardianship is not of sound mind and memory, but it is not conclusive by any means.

WILL—TEST OF TESTAMENTARY CAPACITY.

3. If a testator, when executing his will, understands what he is doing, knows what he has to dispose of and how he wishes it distributed, he has testamentary capacity, though he may be very old, and sick and extremely debilitated and distressed: Swank v. Swank, 37 Or. 439, cited and approved.

WILL—LACK OF TESTAMENTARY CAPACITY.

4. The fact that a person over seventy years old, who had been for many years a believer in the Mormon faith, was in failing health for some time prior to the making of his will, and sometimes talked to the picture of the founder of his church, believing that this deceased person possessed the "keys of the kingdom," and could hear and understand what was said to him, and sometimes cracked his fists together when excited, does not show testamentary incapacity.

WILL—UNDUE INFLUENCE.

5. Whatever undue influence may have been exerted over the testator whose will is here contested was not until after the will had been executed, and so could not have influenced its terms.

From Linn:  REUBEN P. BOISE, Judge.

This is a controversy respecting the probate of an alleged will. The proponent, Andrew J. Ames, filed a petition in the county court of Linn County showing that Lowell Ames, his brother, died in said county April 16, 1899, being at the time a resident thereof, and leaving an estate therein of the probable value of $2,500; that he left a will in which he nominated the petitioner and Joseph S. Ames, another brother, as execu-

*NOTE.—The following cases are in point in connection with this decision: What is a Request by Testator—*Cook* v. *Winchester,* 8 L. R. A. 826, note; *Burney* v. *Allen,* 74 Am. St. Rep. 637, note.—REPORTER.

tors thereof, but that the latter declines to serve as such; that
the testator at the time of executing said will was over twenty-
one years old, of sound and disposing mind and memory; that
he left surviving him, as his only heir, Mary E. Ames, his
widow, about 62 years old, residing at Sweet Home, in said
county,—and praying that such will be admitted to probate,
and letters testamentary issued to him. The will was exe-
cuted January 30, 1899, and it appears therefrom that the
testator bequeathed to his niece Anna Ames the sum of $500;
that he devised to the petitioner the undivided half of his real
property, or, in case he should not die seised thereof, be-
queathed to him in lieu thereof the sum of $1,000; and that
he gave, bequeathed, and devised to said Joseph the remainder
of his property, making no provision whatever for his wife.
The widow, contesting the probate of the will, denied the ma-
terial allegations of the petition, and averred, in substance,
that Lowell for several years prior to his death had been in
failing health, debilitated in body, and of weak and unsound
mind and memory; that his brothers, Andrew and Joseph, well
knowing his physical and mental condition, abducted him
from his home in January, 1899, and prevented him from
returning thereto, and caused him to execute said will by
means of undue influence and misrepresentation, particularly
describing the conduct which it is claimed rendered the testa-
ment void; and that said will was not executed with the for-
malities required by law. A reply having put in issue the
allegations of new matter in the contestant's objection to the
probate of the will, a trial was had before said court, which
found, from the testimony taken, that on January 30, 1899,
Lowell did not possess testamentary capacity; that he was
unduly influenced to execute said will,—denied the probate
thereof, and declared the same null and void. On appeal
from this decree the circuit court found that the testator at
the time he executed the will was of sound and disposing mind
and memory; that in making said will he was not acting under
any undue influence; that the instrument was duly executed,
and decreed that it was the last will of the deceased, admitted

it to probate, and appointed Andrew J. Ames executor thereof, —reversing the decree of the county court, and remanding the cause for such further proceedings as might be necessary; and from the latter decree the widow appeals to this court.

AFFIRMED.

For appellant there was a brief and an oral argument by *Messrs. S. M. Garland* and *H. C. Watson.*

For respondent there was a brief over the names of *Hewitt & Sox* and *J. J. Whitney,* with an oral argument by *Mr. Whitney* and *Mr. Henry H. Hewitt.*

MR. JUSTICE MOORE, after stating the facts delivered the opinion of the court.

It is claimed by contestant's counsel (1) that the testimony shows the purported will was not witnessed in the manner prescribed by law; (2) that, at the time it was executed, Lowell Ames was not of sound and disposing mind and memory; and (3) that he was at that time acting under the undue influence of his brothers, Andrew and Joseph, and hence the court erred in admitting said pretended will to probate. Considering these claims in their order, the testimony involved in each will be examined.

1. The will is dated January 30, 1899, is signed by the testator, and contains the following attestation clause:

"The foregoing instrument, consisting of one sheet, was at the date thereof signed, sealed, published, and declared by the said Lowell Ames as and for his last will and testament, in presence of us, who, at his request and in his presence, and in the presence of each other, have subscribed our names as witnesses thereto.

N. M. NEWPORT, Residing at Albany, Linn County, Oregon.
L. C. MARSHALL, Residing at Albany, Linn County, Oregon."

The testimony shows that Lowell told the attesting witness Newport, an attorney at law, what testamentary disposition he desired to make of his property, and the names of the per-

40 OR.—32.

sons selected as executors, and that a memorandum thereof was made by Newport, who dictated to the attesting witness Miss Lena Marshall, a stenographer in his office, the contents of the will, which she reduced to writing, whereupon he proposed to Lowell that Miss Marshall and he would witness the will, if satisfactory. She was then called from an adjoining room into the main office, where the will was read to and signed by the testator in the presence of the witnesses, and signed by them in his presence and in the presence of each other; but he did not personally request Miss Marshall to witness the will, and may not have heard Newport when he invited her to do so. The statute prescribing the method of executing a testament, is as follows: "Every will shall be in writing, signed by the testator, or by some other person under his direction, in his presence, and shall be attested by two or more competent witnesses, subscribing their names to the will, in the presence of the testator": Hill's Ann. Laws, § 3069. "A subscribing witness is one who sees a writing executed, or hears it acknowledged, and at the request of the party thereupon signs his name as a witness": Hill's Ann. Laws, § 757. No evidence having been offered of a personal request by the testator to Miss Marshall to witness his will, is her signature appended to that instrument in pursuance of Newport's request a sufficient attestation of the testament? It does not appear from the testimony that the door to the room occupied by her was open when she was invited to witness the will, and hence it is impossible to say that any request was made to her in the testator's presence or hearing. In *Nelson* v. *McGiffert,* 3 Barb. Ch. 158 (49 Am. Dec. 170), Chancellor WALWORTH, construing a statute of New York which required the witnesses to a will to subscribe their names thereto at the request of the testator, said: "Not only the witnesses, but the testator himself, must, therefore, have understood that they were witnessing the execution of the will, in conformity to his desire and wish, although he may not have said, in terms, 'I request you, and each of you, to subscribe your names as witnesses to this, my will.' If such a formal re-

quest was necessary to be proved in all cases, and the witnesses were required to recollect the fact, so far as to be able to swear to it after any considerable lapse of time, not one will in ten would be adjudged to be valid.'' Mr. Schouler, in his work on Wills (2 ed.), § 329, discussing this subject, says: ''The request that witnesses should attest and subscribe one's will may be inferred from acts and conduct of the testator, as well as his express words; the law regarding the substance, rather than the literal form, of such matters. It is not essential, therefore, that the testator should expressly ask the subscribing witness to attest his will. His acts, his gestures, may signify this request,—whatever, in fact, implies his knowledge and free assent thereto. Indeed, the active part in procuring the witnesses and requesting them to attest and subscribe is not infrequently borne by some friend, near relative, or professional counsel; and if such third person acts truly for the testator, in his conscious presence and with his apparent consent, the legal effect is the same as though the testator himself had spoken and directed the business.'' In *Re Meurer's Will,* 44 Wis. 392, 399 (28 Am. Rep. 591), it was held that no specific request by the testator to the witnesses to sign the will is necessary, and that if they subscribe their names in his presence, and without objection on his part, he knowing the fact that they are signing as witnesses, it is sufficient. Lowell having seen the witnesses attest his will, and knowing that they subscribed it in that capacity, and having made no objection thereto, the instrument was properly executed: *Coffin* v. *Coffin,* 4 Mass. 1 (80 Am. Dec. 235); *Moore* v. *Moore,* 2 Bradf. Sur. 261; *Rutherford* v. *Rutherford,* 1 Denio, 33 (43 Am. Dec. 644); *Peck* v. *Cary,* 27 N. Y. 9 (84 Am. Dec. 220); *Gilbert* v. *Knox,* 52 N. Y. 125.

2. It is contended by contestant's counsel that, on the day said pretended will purports to have been executed, Lowell was declared incompetent by a court which had jurisdiction of the person and subject-matter, and that the decree therein appointing a guardian of his person and estate raises the disputable presumption that he did not possess sufficient tes-

tamentary capacity at that time, to overcome which required
evidence so strong as to leave no reasonable doubt as to his
capacity to make a valid will, and, the testimony introduced
by the proponent being insufficient for that purpose, the court
erred in admitting it to probate. The testimony shows that
Lowell at the time he executed the will in controversy was sev-
enty-two years old; that he had been married about eleven years,
and lived with his wife on a farm in Linn County, Oregon;
that in January, 1899, George Knable, his wife's son by a for-
mer husband, who had been living with them about eighteen
months, and a companion, accused him of committing the crime
of sodomy, and told him that unless he paid them the sum of
$1,000 each, and conveyed to his wife one half of his real
property, they would cause criminal proceedings to be insti-
tuted against him for the alleged crime; that, thinking he
could secure the arrest and conviction of these persons, he left
home on January 25, with his brother Joseph, and on the
thirtieth day of that month he and his brother Andrew visited
Albany, Oregon, and consulted attorneys, who informed them
that the remedy which they sought as a punishment for the
wrong inflicted was not adequate to the character of the injury
sustained; that one of the attorneys so consulted, believing
that Lowell had been imposed upon by his stepson and the con-
federate, probably in his employ, and thinking that a repeti-
tion of such threats might induce him to part with his prop-
erty, suggested to him the propriety of making a will, and also
of instituting an inquest of lunacy and the appointment of a
guardian; that in pursuance of such advice the will was there-
upon prepared, signed, witnessed, and published; and Lowell
also petitioned the county court of said county to appoint a
guardian of his person and estate, stating therein that his
health was bad, that he was feeble in body, and at times his
memory was poor, that certain persons were endeavoring to
impose upon, cheat, and defraud him out of his property, and
that they had materially injured his estate, that it would be
for the best interests of his property, and conducive to his
health, to be relieved of the burden of caring for his estate,—

and prayed that his brother Andrew might be appointed guardian thereof; that said court on January 30, 1899, made an order reciting the facts stated in said petition, and appointing Andrew guardian of his person and estate; that, an undertaking as such guardian having been given, letters of guardianship were issued April 7, 1899; that, after executing said will, Lowell returned the same day to Lebanon, and the next day his wife took him home. On February 1, 1899, his brothers, Andrew and Joseph, persuaded him again to leave home, and took him to a hotel at Sweet Home, near which he lived, where he remained about two weeks, and then went to and remained with Mrs. Hester Ames, a sister-in-law, until April 10, 1899, when he was taken home, and six days thereafter died.

Lowell was a member of the Church of Latter-day Saints, and occasionally muttered and talked to a picture of Joseph Smith, the founder of the Mormon faith, which hung in his house, believing that Smith, though dead, possessed the "keys of the kingdom," and could hear and understand what was said to him. Lowell was a constant reader of literature of that church, and could repeat many passages from the Book of Mormon, and from other books which he had read when younger; but for several years prior to his death he had been in failing health, and his memory of the every-day affairs of his later life was not retentive. For seven or eight years prior to executing the said will it was his habit to talk to himself when pursuing his ordinary occupation, and he would occasionally become very much excited, in speaking of which the contestant testified as follows: "He was not insane all the time, but his mind was weak as his body, and when he would get anything to worry him, it would worry his mind, and when he would be walking out he would be cracking his fists together like a crazy man." This statement is corroborated in some degree by the testimony of A. M. Cannon, an attorney at Albany, Oregon, who was consulted by Lowell and Andrew in respect to the conduct of George Knable. Cannon says, in effect, that Andrew conducted the conversation, while Lowell

sat with bowed head, and his hands resting upon a cane. This witness, in speaking of the interview, testified in respect to Lowell's apparent interest therein as follows: ''The old gentleman sat and listened, or seemed to, part of the time. Part of the time he didn't; and I questioned him concerning the conduct of this young man,—that is, Lowell,— and whenever he spoke of him he fired up at a great rate and became very demonstrative, and denounced him in unsparing terms. Said he was afraid of him.'' This witness, referring to the testator's mental disturbance when referring to the accusation made against him, testified as follows: ''I wanted to get the facts in the case. He became very excited at these times, clenched his fists, and was very demonstrative.'' The attesting witness Newport, in speaking of Lowell's mental capacity at the time the will was executed, testified as follows: ''I thought he was capable of making a will, or, of course, I would not have written it. He claimed that he was feeling bad, both from the condition of his health, and from the worry over what had been done up there. He claimed his home was broken up, and they were trying to get his property, claimed he was hardly able to be up to them.'' Testimony of this witness fairly illustrates the opinion of most of the other witnesses called upon this branch of the inquiry. Lowell and his brother Andrew first consulted Cannon, Newport's partner in the practice of law, about the accusation made by Knable and his confederate against Lowell, and their demand upon the latter, which, if complied with, was to afford the consideration of their agreement not to prosecute him. In this interview Andrew conducted the conversation, while Lowell seemed to take no part therein. But when Cannon suggested the making of a will, Andrew remarked this was not necessary, as all that was desired was to get rid of Knable, who was annoying his brother, whereupon Cannon advised the appointment of a guardian, so that some person could protect Lowell and his property. Lowell assented to these suggestions, whereupon Andrew and Cannon immediately left the office, and Lowell conferred with Newport about making the will, telling him of his

property, and giving him the names of the persons upon whom he wished to bestow it. Newport testified that Lowell told him that the Annie Ames to whom he bequeathed the sum of $500 was the daughter of a deceased brother, while the testimony shows that she is the daughter of his sister. Newport also says that the testator being unable correctly to describe his real property, they had to get a list thereof from an abstract company.

The appointment of a guardian of a person alleged to be *non compos mentis*, by a court having jurisdiction, must necessarily create a presumption of the mental infirmity of the ward; but such decree does not conclusively show that the testamentary capacity of the person under guardianship is entirely destroyed, and the presumption thus created may be overcome by evidence proving that such person at the time he executed a will was in fact of sound and disposing mind and memory: *Stone* v. *Damon,* 12 Mass. 487; *Breed* v. *Pratt,* 18 Pick. 115; *In re Slinger's Will,* 72 Wis. 22 (37 N. W. 236). The order of the county court appointing Andrew guardian of the person and estate of Lowell, though made on the same day, but after the will was executed, was so nearly related to the making of the will as to impose upon the proponent the burden of overcoming the presumption created by the decree of said court, and of establishing the testamentary capacity of Lowell on January 30, 1899.

3. The testimony shows that the guardian was appointed to prevent George Knable from taking advantage of his stepfather by extorting money or property from him under threats of a criminal prosecution. The petition for the appointment does not allege that Lowell was insane, but it avers, and the order of the county court recites, that he was in ill health, feeble in body, and at times his memory was poor. The testimony shows that the testator retained a vivid recollection of the contents of the books he had read and studied when he was young, but that he could not readily recall to his mind the ordinary incidents of his later life. The depth and intensity of mental impressions always depend upon, and are

measured by, the degree of attention given to the perception of facts, which requires observation, or to the conception of truths, which demands reflection; and hence the inability of a person· to recollect events occurring recently is evidence of mental decay, because it manifests a want of power of concentration of the mind. The aged live in the past, and the impressions retained in their minds are those that were made in their younger days, because at that period of their lives they were able to exercise will power by giving attention. While the inability of a person of advanced years to remember recent events distinctly undoubtedly indicates a decay of the human faculties, it does not conclusively establish senile dementia, which is something more than a mere loss of mental power, resulting from old age, and is not only a feeble condition of the mind, but a derangement thereof. In *Eddy's Case,* 32 N. J. Eq. 701, it was held that mere forgetfulness of recent events in a testatrix eighty-three years old, afforded no evidence of incapacity to make a will. In *Clark's Heirs* v. *Ellis,* 9 Or. 128, the will of a testator about seventy years old was upheld, notwithstanding his memory was faulty, in speaking of which Mr. Chief Justice LORD says: "It is true that the testimony of two or three of the witnesses indicates that his memory was failing, but this was to be expected in one of his age, and might be said of a multitude of old men whose competency for any business is never questioned." The rule is settled in this state that if a testator at the time he executes his will understands the business in which he is engaged, and has a knowledge of his property, and how he wishes to dispose of it among those entitled to his bounty, he possesses sufficient testamentary capacity, notwithstanding his old age, sickness, debility of body, or extreme distress: *Hubbard* v. *Hubbard,* 7 Or. 42; *Clark's Heirs* v. *Ellis,* 9 Or. 128; *Chrisman* v. *Chrisman,* 16 Or. 127 (18 Pac. 6) ; *Luper* v. *Werts,* 19 Or. 122 (23 Pac. 850) ; · *Franke* v. *Shipley,* 22 Or. 104 (29 Pac. 268) ; *In re Cline's Will,* 24 Or. 175 (33 Pac. 542, 41 Am. St. Rep. 851)*; *Swank* v. *Swank,* 37 Or. 439 (61 Pac. 846).

---

*NOTE.—Testamentary Capacity as Affected by Insane Delusions or Old Age—Test of Capacity.

4. Under this rule, we think Lowell Ames, at the time he executed the will in question, possessed testamentary capacity. Because he talked to a picture and expressed the belief that the departed person thus represented possessed the "keys of the kingdom," and could hear and understand what was said to him, does not necessarily imply lunacy; for, if such were the case, it might with equal reason be claimed that many persons who worshiped different personages were *non compos mentis.*

5. It is contended by contestant's counsel that if Lowell, at the time he executed the pretended will, was not wholly lacking in testamentary capacity, he was, in consequence of age, ill health, debility of body, and infirmity of will power, susceptible to persuasion by his friends, and that his brothers, Andrew and Joseph, having knowledge thereof, took advantage of his physical and mental condition, and unduly influenced him to devise and bequeath his property in the manner indicated, attempting thereby to deprive the contestant of all interest therein except such as was given her by statute. These brothers testified that they never in any manner attempted to persuade or even advise the testator to execute a will, or knew that he intended to make a testamentary disposition of his property until at Cannon's suggestion he did so; and their testimony in this respect is not contradicted in any manner. After the will was executed the testator went with his brothers to a hotel, and refused to return with the contestant, saying he was afraid of his stepson, and would not return until he left their home, whereupon she told her husband that, if he would pay her son for eighteen months' labor which he had performed, she would send him away. When the testator was taken home, a nurse was secured, who administered his medicine and prepared his food in his presence, or it was cooked by his neighbors and brought to him; contestant not being called upon to cook for or wait upon him in his last sickness, he claiming to be afraid of being poisoned. The testator on February 17, 1899, commenced a suit against the contestant for divorce on the ground of cruel and inhuman treatment, in

that she, against his wish, suffered her son to abuse him, and confederated with her son to extort property and money from him under a threat of prosecution for the commission of a heinous offense. A plea having been interposed by the contestant showing that the testator had been adjudged insane, the court on March 13, 1899, decreed that the suit abate. Joseph testified that he never said anything to Lowell about his wife's poisoning him, but did tell him that he was in danger from her son. Andrew, in answer to the inquiry, "What, if anything, did you say to Lowell Ames in his lifetime to influence him against his wife, Mary Ames?" said: "Why, I don't recollect saying anything in particular. Q. Did you ever say anything at all, particular or otherwise? A. No. Q. What attempt, if any, did you make to influence him against his wife? A. I never tried to influence him at all." It would seem to be inferable, however, from the testimony of the last witness, who was in fact cross-examined by his own counsel, that, after the will was executed, the brothers and the persons employed by them to assist in caring for Lowell tried to prejudice his mind against his wife, and to prevent her from conversing with him unless some one else was present. The contestant testified that, on the night preceding his death, she, in response to his request, went to his bedside, and, in answer to the question, "What was said?" she replied: "He says, 'Mary, they tell me you have gone back on me.' I says, 'Who?' He says, 'The Rowells.' I says, 'Did you believe it?' He says, 'I did at the time, but now I don't.' " The Rowells referred to kept the hotel at Sweet Home, where the testator was taken by his brothers when he first left home. After his return the nurse found a bottle in his house marked, "Poison," which she showed him, and he remarked that he never knew that there was any poison on the place. Assuming that he was easily persuaded, and that his brothers and the persons employed by them to care for him took advantage of his enfeebled condition and prejudiced his mind against the contestant, did such undue influence render the will theretofore executed void? The purpose to be subserved in considering evi-

dence of the conduct of these parties after the will was made is to determine whether their influence was exerted in procuring the execution of the testament; for it is reasonable to suppose that, since the mind of the testator was prejudiced against the contestant after the will was made, undue influence was exercised by the brothers in persuading the testator to execute a will in conformity with their wishes. The testimony shows that when the will was made the testator did not think the contestant was a party to the scheme of her son to extort money and property from him. He stated, however, that he would expend all his property in employing lawyers, rather than that George Knable should secure one cent of it. The will having been made when he thought his wife innocent, the purpose of his testamentary disposition of his property was not to punish her, but to prevent her son from securing from her any part of his estate. Andrew thought the contestant was trying to secure her husband's property by the means adopted by her son, and so told Newport and Cannon; but as neither he nor his brother Joseph had any knowledge that Lowell intended to make a will, or that the testator even thought of doing so, until such course was suggested by Cannon, we cannot think that the influence relied upon superinduced the execution of the will. When a will has been properly executed, it is the duty of the courts to uphold it, if the testator possessed a sound and disposing mind and memory, and was free from restraint and not acting under undue influence, notwithstanding sympathy for persons legally entitled to the testator's bounty and a sense of innate justice might suggest a different testamentary disposition.

Believing, as we do, that the findings of the circuit court are supported by the weight of the testimony, its decree is affirmed.                                      AFFIRMED.