[Filed April 14, 1890.]

## SARAH L. LUPER, OBJECTOR AND APPELLANT, v. MARY WERTS AND L. F. SMITH, RESPONDENTS.

WILL—WHAT CONSTITUTES—PROBATE—WHAT NECESSARY.—Under the statute of Oregon, every will, in order to be effective, is required to be in writing, signed by the testator, or by some other person under his direction in his presence, and attested by two or more competent witnesses, subscribing their names to the will in the presence of the testator. And in order to admit the will to probate, it must be proven to have been so signed and attested, and that the testator in the case of the disposal of goods and chattels, was over the age of 18 years; and in the case of the disposal of real property, was 21 years of age and upwards, and was of sound mind.

ATTESTING WITNESS—WHO IS.—To prove the attestation of the will, it must be shown that the witnesses who subscribed their names to it did so at the request of the testator; that they saw him sign it, heard him acknowledge it, or observed acts which unmistakably indicated that he had signed it. The acknowledgment, however, cannot be inferred from mere silence.

PROBATE OF WILL—WHAT EVIDENCE NECESSARY.—The proof of a will should not fail because the testimony of the subscribing witnesses thereto is insufficient to establish its execution, provided it can be proven by other competent evidence, or by circumstances clearly indicating its execution; but where such proof is not made, courts have no more authority to adjudge the will effective than they would have to attempt to enforce an oral expression of a party regarding the disposition which should be made of his property at his death.

APPEAL from Linn county: R. P. BOISE, judge.

Martin Werts died in the county of Linn on the thirtieth day of September, 1888. The deceased at the time of his death was an inhabitant of said county, and left real and personal property owned and possessed by him in his lifetime, and left an instrument of writing in the form of a will and testament which purported to dispose of said property. On the fifteenth day of October, 1888, the said instrument of writing, by order of the county court, was admitted to probate in the common form as the last will and testament of the deceased. Thereafter and on the third day of November, 1888, the appellant Sarah L. Luper filed in said county court a petition to vacate the order admitting said will to probate, alleging in her petition that she was the daughter and only heir at law of the deceased, except the widow of deceased, Mary Werts, and that the pretended will was void in that the testator did not make, sign or declare in the presence of the witnesses to said instrument that

the same was his last will and testament, nor was the same attested by such witnesses; that the said testator was not, at the time of signing said instrument, of sound mind and memory, and that he was induced to sign the same by undue influence exerted over him by said Mary Werts and others named as legatees and devisees therein.

An answer was filed to the said petition by the respondents, the administrators, with the will annexed, of the deceased, denying the allegations thereof as to the unsoundness of mind and memory of the deceased, as to the undue influence, and as to the will not having been properly attested by the witnesses.

A large amount of testimony was taken on both sides bearing upon the said issues and upon which the said county court decreed that the said order admitting the will to probate be revoked and the said will set aside, upon the ground that the same had not been duly attested; from which decree the respondents took an appeal to the said circuit court, where the matter was again heard and a decree rendered reversing the decision of the county court and determining that the said instrument of writing was a valid will of the said testator and duly executed as such. From which decree the appeal herein was taken.

*Hewitt & Irvine* and *Chas. E. Wolverton,* for Respondents.

*J. K. Weatherford* and *W. R. Bilyeu,* for Appellant.

THAYER, C. J., delivered the opinion of the court.

It appears from the allegations and proofs herein that one Martin Werts and Mary Werts were husband and wife; that at the time of their marriage said Martin was a bachelor, and said Mary, a widow, had been the wife of one Smith, by whom she had several children then living; that after the marriage, said Martin became the head of the family, and nurtured and supported the said children during their minority; that he and the said Mary had, as the fruit of their marriage, a daughter, the said Sarah L. Luper, appellant herein; that after the said Martin Werts arrived at the age of about 70 years and became enfeebled

in health, he conceived the idea of making a will disposing of his property, which consisted mainly of a tract of land in the town of Tangent, Linn county, and employed one J. J. Beard, a resident of said place, who was supposed to have some skill as a scrivener, to prepare it for him; that the said Beard subsequently prepared a writing, to which the said Martin Werts, on the seventeenth day of July, 1888, subscribed his mark, and which was also subscribed by M. Peyser and said Beard as witnesses. The said instrument is as follows:

"This is my last will and testament: I give to my wife all of my farm and appurtenances, also my houses and lots in Tangent, during her natural life; also all the personal property she can dispose of at her will; and at her death the farm shall be divided as follows: That part of my farm lying north of the county road running through my farm shall be divided equally north and south. I give to Sarah Luper, my daughter, the east half of said land, containing (82) eighty-two acres, more or less; and the west half I give to Mary E. Simpson, the wife of 'J. H. Simpson, and all of the farm lying south of said county road I give to my granddaughter Mary Smith; also give my organ to Mary Smith; I also give my house and lots in Tangent (at the death of my wife Mary Werts) to Lucinda Smith, the wife of L. F. Smith. I name and request E. L. Bryan to be the executor of this will.

"Witness:                                 "His
                                "MARTIN × WERTS.
                                        "mark.
"M. PEYSER.
"J. J. BEARD.

"Dated this 17th day of July, 1888."

The said Sarah L. Luper, mentioned in said writing, was the daughter of the said Martin Werts; the said Mary E. Simpson, a daughter of his wife by the former marriage; the said Mary Smith, a granddaughter of his wife, a daughter of her son, by the former marriage, and the said L. F. Smith, husband of the said Lucinda Smith, was a son of the wife by her former marriage. Mary Smith, the

granddaughter, had resided with Martin Werts from the time she was six months old and been reared by him and his wife as their child.

That the said Martin Werts, at the time he executed the said writing, was competent to make a will, I think was established by the evidence beyond a question. He was able to comprehend the condition of his property, his relations to the persons who were, should or might have been the objects of his bounty, and the scope and bearings of the provisions of the writing he intended as his will; which was held by this court in *Chrisman* v. *Chrisman,* 16 Or. 127, to be sufficient evidence of testamentary capacity. Nor do I think that the evidence in the case was sufficient to warrant the presumption that undue influence was exercised over the said Werts in regard to the disposition which he should make of his property in view of death, or which induced him to execute the said writing he intended as his will. Nor do I discover from the provisions of the writing any evidences that the signer of it was actuated by a spirit of bias or prejudice against any one who might be expected to be the recipient of his bounty, or in favor of any one upon whom he sought to bestow it. His bequest to his wife, of his real property during her natural life, and all the personal property, absolutely was, under the circumstances, a just and wholesome provision, and displayed wisdom and forethought. She was an old lady and was entitled to security against want and dependence and to that attention which the possession of property commands. Why he attempted to bequeath to Mary E. Simpson a part of his farm or to Lucinda Smith the house and lots in Tangent, does not appear; but it certainly was not strange or anomalous under the circumstances of their relations. And the bequest to Mary Smith, a child he had raised from an infant, and who was still of a tender age requiring provisions for her support and maintenance, was very natural and proper. The appellant, it is true, was his own child, and it would ordinarily be expected that he would bestow the main part of his property upon her; but he was under

no legal or moral obligation to do so. She had a husband, and her father may have considered that her pecuniary circumstances were already adequate to her condition in life. Children have no vested rights in the property of their father while he is living, or any interest in it beyond a bare expectancy, the realization of which depends entirely upon his will; and if he were to disinherit them it would not affect the validity of his will, except as it evinced an unnatural feeling which, if proved to have been engendered by some designing party, might be evidence of undue influence. The more serious question in the case is, whether the said writing was executed with the formality which the law requires in the execution of wills. The statute of this State, § 3069, Ann. Laws, provides: "Every will shall be in writing, signed by the testator, or by some other person under his direction, in his presence, and shall be attested by two or more competent witnesses, subscribing their names to the will, in the presence of the testator." And it was held by this court in *Hubbard* v. *Hubbard*, 7 Or. 42, that "where a will has been probated in common form, and the validity of the will is attacked by direct proceedings, it lies upon the person seeking to maintain the validity of the will to re-probate the same by original proof in the same manner as if no probate thereof had been had, except as to such matters as are admitted by the pleadings. In every such proceeding the *onus probandi* is upon the party propounding the will." This seems to be regarded as the proper rule upon the subject, and I believe it to be correct in principle. The formal probate having been made *ex parte*, is not considered of any importance when the validity of the will is attacked by a direct proceeding. The practice, however, in such cases would be very much simplified if the legislature were to require the probate court, when a petition for the probate of a will was filed, to issue a citation to be served upon the parties interested in the estate, to show cause why the will should not be admitted to probate, and have any contest which might be made against it determined upon the

return of the citation. In the latter case the burden of proof, to show that the will offered for probate was executed according to law, would be upon the proponent; and the court, in *Hubbard* v. *Hubbard, supra,* seems to have concluded that the same rule would obtain upon a direct attack of the validity of the will after a formal probate thereof had been had, which seems to me to have been a reasonable conclusion.

The determination, therefore, that the said paper signed by the decedent, and evidently intended as his last will and testament, was executed in conformity with the requirements of the section of the statute above set out, must depend upon the sufficiency of the evidence given upon the part of the proponents to establish the fact.

The legislature, for obvious reasons, required the observance of certain forms in the execution of a will. It requires that the will shall be attested by two or more competent witnesses, subscribing their names to it. The said paper was signed by two persons, who were competent to be witnesses; but whether they attested it as required by the statute, is the question to be solved under the evidence given, and facts and circumstances surrounding the transaction. Proof of the attestation does not alone depend upon the testimony of the subscribing witnesses to the will; the latter may have both died, still the proof could properly be made. In the latter case, proof that their signatures to the will were in their own handwriting, would probably be sufficient; but in this case the proponents have attempted to establish proof of the attestation by the testimony of the subscribing witnesses and that of others.

The testimony upon that point is substantially as follows: J. J Beard, one of the subscribing witnesses, in answer to interrogatories propounded to him, testified that he was 44 years old, resided at Tangent, and was a railroad agent; that he had resided there since 1873; that he was acquainted with Martin Werts in his life-time, had been acquainted with him twelve or thirteen years; that he transacted

business for him; made out a deed, acknowledged a mortgage and wrote out a will for him; that the will was made July 17, 1888, at the request of Werts, who told him what provisions to make in the will at the time it was made, the names of the legatees mentioned in the will and all the terms thereof.

Question.   Did he seem to comprehend at that time what property he had?   Answer.   He named over what is mentioned in the will.

Q.   State whether he seemed to know and comprehend the names of the heirs and those dependent on his bounty? A.  He named over all that are mentioned in the will.

Q.   Where was the will written?   A.  At my office at Tangent, Linn county, Oregon.

Q.   Where was it signed?   A.  At the same time.

Q.   State how it was signed.   A.  Mr. Werts signed it by a mark.

Q.   What kind of a mark and who made the mark?   A. It was a mark made with a pen and ink, a cross; I made the mark while Mr Werts had hold of the end of the pen.

Q.   Who wrote the name at the bottom "Martin Werts" and the words "his mark" above and below the cross?   A. I did.

Q.   At whose request?   A.  Well, I don't know whether he requested me to write it or not; I don't think he did; I asked him if he could sign it, and he said no, he couldn't write; I wrote his name and asked him to make his mark.

Q.   Did you know whether it was his desire to have you write his name for him, or not?   A.  I do not know whether it was or not, but presume it was.

Q.   State whether he knew you wrote it, and assented to your writing it?   A.  I told him I wrote it; don't know that he made any remark; don't know that he said anything at all.

Q.   He made his mark as you have described after the will was written?   A.  Yes, sir.

Q.   State whether the will was read to him or not?   A. Yes, sir; it was.

Q.   Before or after he signed it?   A.   Before he signed it.

Q.   State whether or not he was satisfied with the pro visions contained in it, when it was read to him?   A.   He did not say whether he was or not.

Q.   What did he say when you read it (the will) to him? A.   I read it to him and asked him if that was right, and he said:   "That is the way mother said to do it."

Q.   He understood then fully what was in the will at the time he signed it?   A.   I read the will to him.

Q.   Who are the witnesses to the will?   A.   M. Peyser and J. J. Beard.

Q.   J. J. Beard is yourself, isn't he?   A.   Yes, sir.

Q.   How did you come to sign as a witness?   A.   There was no one else there to sign it except me and Mr. Peyser that I know of at the time.

Q.   Well, you can state how you came to sign it as a witness, and why you signed it as a witness?   A.   I knew it was necessary to have two witnesses to it, and there was no one else there to witness it that I was aware of at the time except Mr. Peyser and myself.

Q.   State whether you signed it as a witness in the presence of Mr. Werts?   A.   Yes, sir.

Q.   State how Mr. Peyser came to sign it as a witness? A.   I asked him to.

Q.   How did you come to ask him to sign it?   A.   I wanted another witness to it, and he was the only man there and I asked him.

Q.   Did Mr. Werts hear you ask him?   A.   I do not know that he did; I went out of the room to get Mr. Peyser; he was out on the front porch when I stepped out; he might have heard me.

Q.   What knowledge did Mr. Werts have that you were about to get or were getting another witness at the time you went to get Mr. Peyser or before going?   A.   I presume I told him I was going to call another witness.

Q.   How far did you find Mr. Peyser from where you were writing the will?   A.   About forty feet.

XIX. OR.—9.

Q. How long had Mr. Peyser been there? A. Probably ten or fifteen minutes; could not say positively.

Q. Could he have heard what you were saying to Mr. Werts? A. He might have heard part of it; don't know that he did; could if he had been listening to hear me read the will.

Q. What did you say to Mr. Peyser when you got him to witness the will? A. I asked him to come in and sign this as a witness.

Q. State what was said when he signed it? A. I believe he asked if it was a note, and I said no, and he said it would not make it any better by his name being on it than it was. I believe that was all that was said.

Q. Did Peyser know what he was signing and the capacity in which he was signing when he signed it as a witness? A. He knew the capacity in which he was signing; don't know whether he knew it was a will or not, but presume he did; couldn't say positively.

Q. Why did you presume that he knew it was a will? A. Well, he could have heard me reading it if he had been listening, and ought to have known what it was if he heard it.

Q. How long after you signed it until you called Peyser to sign it? A. I called Mr. Peyser to sign it before I signed it at all.

Q. State whether Mr. Peyser looked at the instrument and saw the manner in which Mr. Werts had signed the paper? A. I don't know whether he did or not; I called him in and he sat down and signed the paper.

Q. Did he sign after Mr. Werts had made his mark? A. Yes, sir.

Q. Was he acquainted with Mr. Werts, do you know? A. Do not think he was; do not know, but do not think he was.

Q. How long did Peyser remain in the room? A. I think he got up and went right out as soon as he signed his name. It was a very small room and there wasn't room for so many in there.

Q.   Before or after you signed it as a witness?   A. I think he stepped right out of the door and I sat right down and signed it; he wouldn't have to step but a couple of feet.

Q.   Did Peyser know that you were signing also as a witness?   A. I do not know whether he did or not.

Q.   How long after that did old man Werts leave the office?   A. Well, right away; he got up in a very few minutes; he went out, I think; he and Mr. Peyser went out into the front part of the store together.

Q.   What directions did Mr. Werts give you regarding the will after it was executed?   A. After he had gone out into the front room I took the will and asked him what I should do with it.   He told me to keep it and read it after he was dead.   I asked him if I hadn't better give it to Mr. Bryan, and he said it didn't make any difference, and that I had just as well keep it.

Q.   Was Peyser present at this conversation.   A. I believe he was in the store; yes, sir.

Here a paper was handed the witness, and he was asked: "Is that the will of Martin Werts, executed at the time referred to by you heretofore in this deposition?" Answer: This is the will that I wrote at the request of Martin Werts.

The witness further testified that he made the proof upon which the will was formally admitted to probate; that all the facts stated in the affidavit of proof, except the part thereof wherein it is stated "that he then and there declared his will to be the same as stated in his last will and testament," were true.

Mr. Peyser, the other witness to the will, testified that he was 48 years of age, his residence was Albany, Oregon, and his occupation trading; that he saw Martin Werts around Tangent, but did not know what his name was. Upon the will being shown to the witness, and he being asked if he recognized the signature "M. Peyser," and if so to state who wrote it, answered, "I wrote it myself." That the way he came to write it, he was at Tangent on

business, and Mr. Beard called him to witness a paper and he did so.

Question: What other signature, if any, did you see attached to the instrument at the time you signed your name? Answer: I saw a name there, but did not pay any attention to it whatever.

Q. Point out the name you saw on the paper at the time you signed your name there? A. I couldn't do it; I didn't pay no attention to the name.

Q. Was the name you saw at the time you signed your name located toward the right hand side of the paper you signed or the left? A. The right side.

Q. State whether J. J. Beard's name was signed to that paper as a witness at the time you signed it? A. No, sir.

Q. State what knowledge you had of J. J. Beard signing it after you signed it? A. I have none whatever.

Q. What did J. J. Beard do immediately after you signed it? A. I could not tell what he did. He was present when I signed it as a witness; was standing right on the side of me; I think he gave me his chair; I believe it was his chair.

Q. Did you see Mr. Beard doing anything before you went out or while you were going out, and if so state what he was doing? A. I didn't take any particular notice; could not tell whether he took a seat or not or about the time I left.

Q. Where was Martin Werts at the time you wrote your name to the will? A. There was an old gentleman sitting there in the office; I didn't know his name as I was not acquainted with the old gentleman at all; I was only acquainted with him by sight; I could not tell the distance he was sitting from me when I wrote my name as a witness to the instrument, but it was not very far. He could see me plainly at the time I signed my name, if his attention had been directed toward me, or if he had wished to see me. He was in the same room with me at the time I signed it.

Q.  Where was J. J. Beard at the time he called you to witness the paper?  A. He just came out of a little room where I believe the post-office was kept; I was standing in the door or on the porch of the building; I must have been twenty feet or more from the little room.

Q.  Give your best judgment how far this old man who was in the room was from J. J. Beard at the time he called you to witness the instrument.  A. I could not tell the distance, but Mr. Beard was standing close to me.

Q.  Where was Mr. Beard at the time he called you; how far from the post-office room?  A. I could not tell; I didn't take any particular notice; I cannot approximate the distance.

The witness was here shown a diagram of the ground floor of the building, showing that it was partitioned into three rooms,—a large front room occupied as a store, and two small rooms, one of which was a bedroom and the other a post-office room with a door-way between them, and one from the bedroom into the store.  The store-room is about 30 feet in length.

The witness was then asked where he stood and where J. J. Beard stood at the time Beard called him to sign as a witness, to which he answered, in substance, that he stood in the front part of the building, and that Mr. Beard stood somewhere back in the store; that he came out of the post-office room and was standing near the door which goes from the store into the bedroom; that the old man was in the post-office room when witness went in there after being called by Beard; that he did not see him go into the room; thought he heard some one in the room before he went in, but did not hear anything said which he could understand. It was a human voice, but could not tell whether the party was reading or talking.

Question.  What was the condition of the old man's mind at the time you signed the instrument as a witness?  Answer. Well, I couldn't tell what his mind was; he looked kind of strange to me; kind of wild look on him.

Q.  What did you understand you were signing your

name to that instrument for, at the time you signed it? A. Well, I didn't understand anything; they simply called me in to witness the paper, and I made the remark: "You don't want me to sign any money matter, do you?"

Q. What was the extent of your acquaintance with the old man at the time of signing the instrument? A. Not any.

Q. You knew him when you saw him, didn't you? A. I knew him when I saw him in Tangent, but did not know his name; that is all the place to my recollection that I saw him.

J. A. McGee testified: "I heard Joe Beard reading the will; I don't know where Mr. Peyser was when the will was read; I didn't hear Mr. Werts say anything."

J. A. Sibbetts testified: "I seen Mr. Werts go into the post-office the day the will was written; I seen him at the front door at the time; some one called Peyser on the inside of the office; Peyser stood opposite the door on the out-side; I recognized the voice of the person calling Peyser as that of J. J. Beard; it was simply a request to step into the office; I heard no reading or talking in the back room until Mr. Peyser was called; I heard nothing about writing a will at that time; I was sitting on a chair on the north side of the outside door when Mr. Werts entered the post-office; this was the front door of the post-office building; when Mr. Beard called Mr. Peyser, he, Peyser, was stand-ing about three and one-half feet away and on a line with the south side of the door; I had been sitting exactly in the same position and place I have described all the time after Mr. Werts went into the post-office up to the time Beard called Peyser; can't state definitely the length of time Peyser had been on the porch prior to the time he was called by Beard; I only noticed him about fifteen or twenty minutes before he was called; it might have been longer; when Beard called Peyser, it was in just an ordinary business tone."

The foregoing is not literally all the testimony in the case upon the question of the attestation of the instrument;

but it is the material part thereof, and unless it establishes the attestation of the alleged will, as required by the section of the Code above set out, the proponents of it must fail in their proof of its due execution.

The statute of this State, § 757, Ann. Code, defines what a subscribing witness is. He "is one who sees a writing executed, or hears it acknowledged, and at the request of the party thereupon signs his name as a witness." And I think the word "attestation," in the absence of any statutory definition, implies the same thing. A subscribing witness to a will, therefore, must be something more than a person who subscribes his name as a witness to it. The testator must either sign the will in the presence of the witness, or must acknowledge to him by word or act that he had signed it. It is not necessary that the witness know the contents of the instrument subscribed by him, or its nature or character, but he must be able to testify that the principal in the affair put his name upon the identical piece of paper upon which he placed his own. Harlan Canada's Appeal from Probate, 47 Conn. 450.

Counsel for the proponents at the hearing did not question the correctness of the rule as here indicated; but insisted that the facts and circumstances of the transaction authorized the inference that the decedent acknowledged the execution of the instrument. As to the witness Beard, no acknowledgment by the decedent of the execution of the instrument was necessary, as he was personally cognizant of the fact that the decedent signed it by making his mark; but the witness Peyser did not see the signing done, and could not obtain such a knowledge of its having been done as would render him a competent witness to the fact unless, at the time he subscribed the instrument, the decedent in some manner acknowledged its execution. Said counsel lay down the proposition that it is not essential in the execution of a will that the witnesses to it see the testator subscribe the instrument; that he acknowledges or adopts the signature in their presence is sufficient; that the acknowledgment is not required to be made in

any particular words or in any specified manner, but if, by sign, motion, conduct, or attending circumstance, the attestating witness is given to understand that the testator had already subscribed the instrument, it is sufficient acknowledgment. And the counsel cite in support of the proposition the following authorities: *In re Will of Lawrence Convey*, 1 Am. Prob. R. 90; *Raudebaugh* v *Shelley*, 6 Ohio St. 307, 315; *Haynes* v. *Haynes*, 33 Ohio St. 615; *Nickerson* v. *Buck*, 12 Cush. 342; *Tilden* v. *Tilden*, 13 Gray, 110; Schouler on Wills, §§ 321, 322. This proposition, as a matter of law, is undoubtedly correct, and the authorities cited fully support it. The difficulty, however, which the said counsel have to contend with is in the application of the principle to the facts of this case.

If it appeared from the evidence bearing upon the point involved that the decedent acknowledged or adopted the signature to the instrument as his own in the presence of the witness Peyser, either from the testimony of the latter or from that of any other witness, or that by any sign, motion, conduct, or attending circumstance, he gave said witness to understand that he had already subscribed the instrument, I should not hesitate to hold, as I am at present advised, that it was a sufficient acknowledgment; but I fail to discover any evidence which would warrant such a conclusion. The evidence shows that the decedent, while the said witness was subscribing his name to the instrument, maintained "mere silence," which "is not enough." *Haynes* v. *Haynes*, *supra*. If the decedent had said to the witness Peyser: "This is my will," or if the witness Beard had said in the presence of the decedent and Peyser, "This is the will of Mr. Werts; he has signed it and wants you to subscribe your name to it as a witness," or used any language of that import, the contention of the proponent's counsel might have been tenable. Under the testimony, however, as it stands, I do not see how by the most liberal construction of it, Peyser could have been a competent witness to the will. He could not testify that the decedent signed the will; he did not see him sign it, and

was not informed by any one, so far as appears from the evidence, that he did sign it, or adopt the signature thereto as his own.

The facts in the case of *Nickerson* v. *Buck* and in *Tilden and others* v. *Tilden, Executor, supra,* from which the courts in these respective cases inferred that the testators to the said wills had acknowledged the execution of the same, were much stronger than in this case; yet I think the courts there, especially in the latter case, extended the doctrine of inferential evidence to its utmost verge. It is not a pleasant duty to be compelled to determine that the intention of a party to honestly dispose of his property by will and testament was thwarted by his failure to comply with an apparently technical exactment of the law; but the aim and object of the statute, in requiring the observance of certain formalities in the execution of such instruments, is entitled to due consideration. Otherwise a door to fraud and forgery, in the disposition of estates *causa mortis,* would be thrown wide open.

Counsel for the proponents strenuously urge that the witnesses to the instrument in question, in giving their testimony as to its execution, exhibited a disposition to suppress the facts regarding it; and insist that the will and testament of a party honestly made should not be defeated by the failure of memory of the witnesses nor by their false swearing. The argument viewed from a moral standpoint is undoubtedly sound; but I do not see how it can aid the proponents' case herein. They were required to prove the due execution of the will, and if they have failed in that respect in consequence of the lack of memory or the false swearing of the witnesses, it is the misfortune of those interested in the matter of its proof. If the court believed that the witnesses to the said instrument had wilfully neglected and refused to state under oath all the facts they knew concerning its execution, still it would not be authorized to hold that the instrument was a valid will of the decedent unless there was other evidence in the case showing that it was executed in compliance with the

requirements of the statute. The proof of a will should not fail because the testimony of the subscribing witnesses thereto is not sufficient to establish its execution in accordance with the statute, provided it can be proved by other competent evidence to have been so executed; but where such proof is not made, the courts of this State have no more authority to adjudge it effective than they would have to attempt to enforce an oral expression of a party regarding the disposition which should be made of his property at his death.

Under the view herein expressed the decree of the circuit court must be reversed, and that of the county court affirmed.

LORD, J., dissenting.—Peyser is an unwilling witness, of an unreliable character, whose testimony as disclosed by the record indicates a purpose to defeat the will. That it ought not to be allowed to succeed, if it can be prevented consistently with a proper administration of the law, is admitted. The difficulty lies in determining the sufficiency of his evidence as an attesting witness. The testimony of Beard, the other witness to the execution of the will, is conceded to be competent and sufficient, and the will must stand or fall upon the sufficiency of the testimony of Peyser in the light of the surrounding facts and circumstances. Briefly the facts are these: The testator sought Beard and requested him to write his will, and together they went to a small office in the back of a store, where Beard wrote it and the testator signed it. Beard then went to the front door of the store and asked one Peyser to come into the back office and witness it, but without disclosing to him the nature of the instrument. When Peyser signed it he saw the signature of the testator to the will, who was sitting quite near him, and knew the purpose for which Peyser signed it, but he did not declare to Peyser in words that it was his signature, nor did Peyser know it other than from the fact of his presence and acquiescence under the circumstances. When the will was offered for

probate Peyser swore that the instrument and the signature was the same as when he witnessed it, so that as to its identity there is no doubt.    But the contention is that Peyser must be able to swear that he knew that it was the signature of the testator, either from seeing him write it or from his acknowledgment, by words or acts, and that the testimony of Peyser falls short of this requirement.

It is admitted that the testator is of sound mind, and that the will is the product of his own free agency; nor is it doubted, in view of all the facts in evidence, that it was executed by him as his last will and testament.

It is clear from the evidence that the testator knew what he was doing when he procured Beard to write his will and he himself signed it, and what Peyser was doing when he witnessed it, so that if there is anything in his conduct under the circumstances at the time Peyser signed which amounted to an acknowledgment that the will was executed by him, we ought so to declare, and not allow his last will and testament to be set aside and defeated. Within a little more than an inch from the place on the paper where Peyser signed as a witness was the signature of the testator, which he admits that he saw at that time, and within a few feet of him sat the testator, and no one else except Beard was present.   Peyser was there at the instance of Beard, who had called him into the office to witness a document which he saw was already executed, and when he proceeded to witness it, and the testator, knowing the facts, looked on and said nothing, was not his silence, in the light of the facts, an acknowledgment that the will was executed by him?

When I see a man's name to a paper document, and he is present, and no one else except the scrivener, and I am there to witness it, and when I do so he looks on but says nothing, is not his acquiescence, under the circumstances, an acknowledgment to me that the will and signature are his own?   In the light of the facts, Peyser had a right to assume and understand that the will was executed by the testator then present, because his conduct in the premises

was declaratory of that act; and when that assumption is sustained by the undisputed testimony of the other witness, and is inconsistent with any other conclusion to be drawn from the whole evidence, it carries to the mind a declaration or acknowledgement as direct and positive that the testator, then present, executed the instrument, as if he had so declared or acknowledged it to him in words.

In determining this question, we are to consider all the facts in evidence relative thereto, and not base our con clusions upon isolated testimony of the witness Peyser; and when thus viewed, if it is clear from the attending circumstances that the testator executed the will, and that Peyser knew it, because as a reasonable being the conduct of the testator under the circumstances so informed him, it is our duty to hold such facts equivalent to such an acknowledgment, and uphold the will. In *Tilden* v. *Tilden*, 13 Gray, 113, the only difficulty in the case there was, as here, upon the fact of a proper attestation of the witness. The court say: "In reference to this witness, it is said there was no publication of the will by the testator, no actual signing in his presence, no direct acknowledgment that he had signed the paper, and no knowledge on the part of the witness whether the testator's signature was on the paper at that time"; and yet the court upon the evidence found that the instrument had been duly signed by the testator, and duly attested as his last will and testament. See also *Dewey* v. *Dewey*, 1 Met. 349; *Nickerson* v. *Buck*, 12 Cush. 339; *Hayes* v. *Hayes*, 33 Ohio St. 615; Schouler on Wills, §§ 321, 322.

There is no suggestion that there has been any fraudulent substitution of a false paper or will, nor is there any thing in the facts to countenance any such supposition. We are all convinced that the will was executed by the testator, only my associates think that the testimony of Peyser does not fulfil the requirements of the law. To my mind, in view of the facts and circumstances, Peyser could not avoid knowing that the testator, then present, executed the will; the facts so informed him and authorize the

inference that the testator acknowledged the signature of the will to be his act, though he did not expressly so state. In my judgment, then, the facts as disclosed by this record authorize us to find that the instrument was duly signed by the testator, and was duly attested as his last will and testament. It ought, therefore, to be upheld, and his property disposed of according to its direction.