Argued October 20, decided November 11, rehearing denied December 30, 1913.

## WENDL *v.* FUERST.

(136 Pac. 1.)

**Wills—Probate—Burden of Proof.**

1. The burden of proof is on the proponent of a will to establish every fact necessary to show the proper execution of a valid will.

**Wills—Signature by Testator—Evidence.**

2. Evidence in a will contest *held* insufficient to show that the signature of decedent to the will was a forgery.

**Evidence—Weight of Evidence—Expert Testimony.**

3. The evidence of experts in all cases should be received and weighed with caution.

Wills—Right to Assert Validity—Estoppel—Representations.

4. Representations by the authorities of an abbey that deceased, dying at the abbey, had made over all his property to it, and had left no will, will not estop the authorities from claiming that the will was executed, where such representations were not believed by the heirs.

Wills—Execution—Validity—Sufficiency of Evidence.

5. Evidence in a will contest *held* sufficient to establish the due execution of a will within Section 7319, L. O. L., requiring a will to be in writing, signed by the testator, or by some person under his direction, in his presence, and attested by two or more competent witnesses subscribing their names to the will in his presence.

[As to attestation and witnessing of wills, see note in 114 Am. St. Rep. 209. As to signature of testator "at end" of will, see note in Ann. Cas. 1913C, 845.]

From Marion: WILLIAM GALLOWAY, Judge.

This is a will contest by John B. Wendl and Regina Wendl against Rt. Rev. Placidus Fuerst, abbot of St. Benedict's Abbey of Mt. Angel, Oregon, and the Very Rev. Adelhelm Odermatt, O. S. B., prior of St. Benedict's Abbey, Mt. Angel, Oregon, and the Order of St. Benedict's Abbey, a corporation, of Mt. Angel, Marion County, Oregon. The will was admitted to probate and contestants appeal.

AFFIRMED: REHEARING DENIED.

For appellants there was a brief over the names of *Mr. Frank Holmes* and *Messrs. Conley & De Neffe,* with oral arguments by *Mr. Holmes* and *Mr. James L. Conley.*

For respondents there was a brief over the names of *Mr. Myron E. Pogue* and *Mr. Woodson T. Slater,* with an oral argument by *Mr. Pogue.*

Department 1. MR. JUSTICE RAMSEY delivered the opinion of the court.

Rev. Emmeran D. Wendl, a Roman Catholic priest, died at Mt. Angel, Marion County, Oregon, on the

twenty-third day of November, 1910, at the age of 67 years. He had never been married, and he left surviving him as his sole heirs at law the contestants, John B. Wendl, his brother, and Regina Wendl, his sister. The contestants are not residents of this state. They, too, are members of the Roman Catholic church.

Rt. Rev. Placidus Fuerst is the abbot of St. Benedict's Abbey, at Mt. Angel, and Very Rev. Adelhelm Odermatt, O. S. B., is the prior of said abbey.

The decedent, Emmeran D. Wendl, was an oblate but not a member of the Order of St. Benedict. He made his home there for about two years immediately prior to his death, although he had done some clerical work during that time in Portland. While he was at work in Portland, he was stricken with nervous prostration caused by overwork. He was in St. Vincent's Hospital for a while, but returned to the abbey at Mt. Angel, and became an oblate of the Order of St. Benedict, and remained at the abbey until his death, which occurred November 23, 1910.

The decedent left no real estate but owned when he returned to the abbey from Portland, a $3,000 mortgage and several hundred dollars in money, deposited in banks, and a $300 life insurance policy, and a small library. The evidence fails to show that he had any other property. Jas. L. Conley was appointed administrator of the estate of the decedent by the County Court of Marion County, and letters of administration upon said estate were issued to him.

On February 8, 1911, Very Rev. Adelhelm Odermatt, prior of said abbey, presented to the County Court of Marion County his petition in due form, alleging *inter alia* that said decedent, Rev. Emmeran D. Wendl, died at the Mt. Angel Abbey, Marion County, Oregon, on the twenty-third day of November, 1910, and that he executed a certain instrument of writing purporting to be his last will and testament,

dated November 17, 1910, which was duly subscribed, executed, and witnessed, as required by law. The witnesses who subscribed said will as attesting witnesses being Rev. Thomas Meier, O. S. B., and Rev. Urban, O. S. B., both residing at said abbey. Said petition alleged all the facts necessary to be set forth in such a petition and annexed thereto a copy of said will and prayed for an order of said County Court admitting said will to probate. Said petition asked also that Very Rev. Adelhelm Odermatt, prior of said abbey, who was named in said will as executor thereof, be appointed executor of said will, without bonds, according to the terms of said will, and praying also for an order revoking the appointment of said Jas. L. Conley as administrator of said estate, etc. The County Court admitted said will to probate in common form and made an order revoking the letters of administration granted to said Jas. L. Conley and generally granted the prayer of said petition.

On March 31, 1911, John B. Wendl and Regina Wendl, as the heirs at law of said decedent, filed in the County Court of Marion County their petition in due form for the contest of said will, alleging the necessary facts for such contest. As grounds for such contest, said petition alleged that said instrument, purporting to be the will of said decedent and admitted to probate as stated, *supra,* was not the will of the decedent; that he did not sign said instrument; that it was not witnessed, signed or published by him as his will; that it was not attested at his request or in his presence; and that it was not executed by him at all. The said petition for the contest of said will alleged also that the name of the decedent was forged thereto. It also alleged that the decedent was in such a condition mentally that he was unable to comprehend the meaning, scope or effect of said instrument, and that said will was procured to be so executed by the de-

cedent by the undue influence of the proponents, etc.
The proponents denied the material averments of said
petition, and then set up the due execution of said will
and asked that it be re-probated in solemn form.

The evidence was taken in the County Court, and
that court made and entered an order holding that said
will was duly executed and readmitting said instru-
ment to probate as the last will and testament of said
decedent, etc.  The contestants appealed from said
order to the Circuit Court of Marion County, and that
court affirmed the order of the County Court admitting
said instrument to probate.  The contestants appeal
to this court.

Owing to the large amount of evidence, it is im-
practicable to do more than to refer to the substance
of it.

The proponents of the will show by many witnesses
that the decedent, during his last illness, and at the
time that the will was executed, was of sound and dis-
posing mind and memory, and the contestants offered
no evidence on that point.  There was no evidence
offered tending to prove that the execution of said
will was obtained by undue influence or fraud:

The sole question for determination is: Did the
decedent execute as his last will and testament the
paper propounded by the respondents and which was
admitted to probate by the County Court of Marion
County?  This document is in proper form and fair
on its face.

1. The burden of proof is on the proponents of the
will to establish, by a preponderance of the evidence,
every fact necessary to show the proper execution of
a valid will: *Hubbard* v. *Hubbard,* 7 Or. 44; *Duper* v.
*Werts,* 19 Or. 126 (23 Pac. 850); *Mendenhall's Will,*
43 Or. 548 (72 Pac. 318, 73 Pac. 1033).  To be valid,
a will must be in writing, signed by the testator, or by
some other person under his direction in his presence,

and attested by two or more competent witnesses subscribing their names to the will in the presence of the testator: Section 7319, L. O. L.

2. Attesting witnesses must sign the will as witnesses in the presence of the testator. The attesting witnesses to this will are Thomas Meier, O. S. B., and Urban Fisher, O. S. B., both residing at Mt. Angel. The third and fourth paragraphs of this will are as follows:

"Thirdly. In consideration of Rt. Rev. Abbot Placidus Fuerst and his consultors having given me a comfortable home, for life, to take care of me in the days of health and sickness, in life, and after death, to treat and bury me like one of their own community, I hereby give and bequeath to the said Rt. Rev. Placidus Fuerst, abbot of St. Benedict's Abbey of Mt. Angel, Oregon, all my property and belongings, among which is one mortgage of three thousand dollars ($3,000.00) which I hold in the City of Milwaukee, Wisconsin.

"Fourthly. My brother John B. Wendl of Milwaukee, Wisconsin, and my sister Regina Wendl of Chicago, Illinois, shall each receive fifty dollars ($50.00)."

When the will was executed there were present in decedent's room with him at the abbey Thomas Meier and Urban Fisher, the attesting witnesses, and Very Rev. Prior Adelhelm Odermatt. Each of these persons was sworn, and each testified in detail as to the execution of the will. The evidence of these witnesses shows that the decedent desired to execute a will and that Father Urban was sent for to write the instrument. He was a notary public and accustomed to writing wills, and he had printed forms for wills. After Father Urban arrived in the decedent's room, the latter dictated the contents of the will, and Father Urban wrote the instrument in the presence of the

decedent and of the attesting witnesses. The decedent then subscribed his name to the will in the presence of said witnesses and declared it to be his last will and testament and requested the two witnesses to sign the will as attesting witnesses, and they so signed in the presence of the deceased and of each other. If the evidence of these witnesses is true, the will was duly executed.

After the will was executed, it passed into the hands of Father Jerome, the secretary of the abbey, for safe-keeping. A few days after the will was made, the decedent asked Father Jerome whether he had seen his will, and Father Jerome told him that he had read it, and this witness says that the decedent, when he told him that he had read his will, expressed his satisfaction that he had turned over everything to the abbey and said that he could now die satisfied. Father Jerome testified that he knew the decedent's handwriting, and that the signature to the will was his genuine signature.

Benedict Hinz testified that the decedent told him, a few days before his death, that he was getting pretty weak and that he should like to see Father Prior or one of the superiors, saying that he had some papers to sign yet. The deceased told this witness that he would let the abbey have whatever property he had left. A few days before his death the decedent told Dr. J. E. Webb, his attending physician, that he expected to die and that he had settled his business.

Rt. Rev. Abbot testified that he was acquainted with the handwriting of the deceased, and that the name of the decedent at the end of the will was the genuine signature of the deceased. The decedent talked with him several times about making a will and talked to him about it after he had made it.

Joseph Keber, cashier of the bank at Mt. Angel, testified that the deceased did business with him at

68 Or.—19

the bank, and that in his opinion the signature to the will is genuine.

Father Gall Eugester testified that he knew the decedent's handwriting, and that the signature to the will is his genuine signature.

Father Paul Manion testified that the signature to the will was the genuine signature of the decedent.

There were present, besides the decedent, when the will was executed, three persons, and each of them testified that the decedent signed the will with his own hand, and three other witnesses, who knew his handwriting, testified that the signature to the will was his genuine signature. He talked to two persons, after he had made the will, and told them that he had made a will and talked about it to them. The evidence for the execution of the will is strong.

The evidence offered by the contestants to show that the name of the decedent at the end of the will is a forgery is the evidence of his brother, who testified that it is not his signature, and the evidence of W. W. Williams and M. A. Albim, who testify that they are handwriting experts. They testify that they have for many years studied handwriting and have appeared as expert witnesses in a number of important cases. Each swears that the signature to the will is a forgery. Mr. Williams swears that it is not possible that he is in error when he pronounces the signature a forgery: Ev., p. 259.

Two or three of the officials at the monastery informed John B. Wendl and Mr. Conley, when they were at the abbey, that the decedent left no will. Very Rev. Prior explains why they said that he left no will thus (Ev., p. 155): "It [the will] was in existence for our own protection, but according to the instructions of a dying man, Rev. Emmeran D. Wendl. He told me to keep that will secret and confidential, and not to probate it in case the mortgage was paid. It did not

exist in case the mortgage was paid. But it did exist from the seventeenth day of November at 3 o'clock in the afternoon to protect us (St. Benedict's Abbey) against everyone who would contest the property that he had turned over to us on the mortgage or the last will. I think this will cover it all. This John B. Wendl told me, with his own lips (we were in the graveyard), if Father Wendl wanted to give Father Placidus (the abbot) this mortgage because you gave him a home he could do so; that was his own business; leaving me under the impression that he was willing for the abbot to get the mortgage and collect the mortgage, etc."

It was shown by the evidence that in the fall of 1910, after he returned from Portland, Father Wendl, the decedent, made a contract with the abbot that he would turn over to the abbey all of the property that he had, and in consideration thereof the abbot, for the abbey, agreed that the abbey would give him a permanent home at the abbey all his remaining days and support and care for him and bury him the same as one of their own order, although he was only an oblate. In addition to supporting and caring for the decedent during his life and burying him after he was dead, the abbot agreed that 1,000 masses should be said for the repose of the decedent's soul. These masses for the dead are celebrations of the Holy Eucharist with prayers for the repose of the soul of the dead person. These masses for the dead are devoutly believed in by the Catholic church. This contract was made some time before his death. He was to turn over to the abbey the $3,000 mortgage referred to, and all other property by him then owned.

It appears from the evidence that they sent to Wisconsin for some papers for the purpose of making a regular transfer of the mortgage to the abbey and that there was some delay in getting these papers. How-

ever, they arrived about five days after the will was made, and the decedent executed them and a check for what money he had some hours before his death and turned them over to the abbey.

The evidence shows that the decedent wanted to turn over to the abbey all of his remaining property before his death, and that he did not want the will made public or probated unless the abbey should have trouble in collecting the mortgage or with his heirs.

John B. Wendl, in his evidence, says that he had not seen the decedent often since boyhood. The deceased told John B. Wendl (Ev., pp. 160, 161), that he had given his sister $1,000, and John B. Wendl then asked him why he did not give him money. He says that the deceased told him that he would leave all his property to him and Regina.

John B. testified that he always expected that his brother would leave him and Regina whatever he had. He says that the decedent told him that he was a poor man. He says he once asked the decedent what he was worth, and the latter said, "Oh, I have got a little money, not much." The witness then adds (Ev., p. 165): "Just might as well talk to this table as to talk to him about finance. He wouldn't tell anybody." There was no evidence tending to prove that the decedent had any property excepting the $3,000 mortgage and a few hundred dollars in the bank and an insurance policy for $300 and a small library. All of those he turned over to the abbey.

The evidence of the handwriting experts and the evidence of John B. Wendl are all the testimony produced to prove that the will was not executed by the decedent. These witnesses had no knowledge in relation thereto. What they testified to was opinion evidence only. They asserted with vehemence that the signature to the will was not genuine. Is it reasonable to ask a court on such evidence to hold that the

signature of the decedent to the will is a forgery, in the face of the positive evidence of the three witnesses who swear that they saw him sign the will, and the evidence of two witnesses who testify that he told them that he had made a will, and the evidence of several other witnesses who swear that they know his signature and that the signature to the will is genuine?

In volume 5 of Encyclopedia of Evidence, page 643, that work says:

"Generally the testimony of an expert will not be allowed to overthrow positive and direct evidence of credible witnesses, who testify from their personal knowledge."

In *Grigsby* v. *Clear Lake W. Co.,* 40 Cal. 405, speaking of expert witnesses, the court says:

"A contrary practice, however, is now probably too well established to allow the more salutary rule to be enforced, but it must be painfully evident to every practitioner that these witnesses (experts) are generally but adroit advocates of the theory upon which the party calling them relies rather than impartial experts upon whose superior judgment and learning the jury can safely rely. * * Such evidence should be received with great caution by the jury."

In the case of *Tracy Peerage,* 10 Clark & F. 191, Lord CAMPBELL says:

"Hardly any weight is to be given to the evidence of what are called scientific witnesses. They come with a bias on their minds to support the cause in which they are embarked."

In *Foster's Will,* 34 Mich. 25, the court says:

"Everyone knows how very unsafe it is to rely upon anyone's opinion concerning the niceties of penmanship. The introduction of professional experts has only added to the mischief instead of palliating it, and the results of litigation have shown that these are

often the merest pretenders to knowledge, whose notions are pure speculations. * * Every degree of removal beyond personal knowledge, into the domain of what is sometimes called with great liberality scientific opinion, is a step toward greater uncertainty, and the science which is so generally diffused is of very moderate value."

In *Cowan* v. *Beall,* 1 McArthur (D. C.), 270, 274, the court says:

"The signatures of these papers are claimed not to be genuine, and here we are treated to the opinions of half a dozen men who claim to be experts and who come up and give us their views as to the genuineness of these signatures. Of all kinds of evidence admitted in a court, this is the most unsatisfactory. It is so weak and decrepit as scarcely to deserve a place in our system of jurisprudence."

In *Wright* v. *Williams' Estate,* 47 Vt. 234, the court says:

"It would be trite to repeat the very uniform expression of judges and the books as to the small value of this kind of evidence (expert evidence), yet it is warrantable to say that such expression is corroborated by our observation and experience in judicial administration."

In *United States* v. *Darnaud,* 3 Wall. Jr., 183, Fed. Cas. No. 14,918, Justice GRIER says:

"Whether the signatures appear to be done by the same hand, that, I think, is a question you can put to an expert. Though the testimony is of rather a dangerous character and not much to be relied on."

In *Mutual Benefit Life Ins. Co.* v. *Brown,* 30 N. J. Eq. 201, the court says:

"All doubt respecting the competency of the opinion of experts in handwriting, based upon mere com-

parison, as evidence has been removed by statute; but it still must be esteemed proof of low degree. Very learned judges have characterized it as much too uncertain, even when only slightly opposed, to be the foundation for a judicial decision.''

3. Rogers on Expert Testimony, pages 65, 66, says:

''But in all cases the testimony of experts is to be received and weighed with great caution. As a judge in one of the Irish courts expressed it: 'Such evidence ought, as all evidence of opinion ought, to be received and considered with narrow scrutiny and with much caution.' ''

We believe that the rule stated by Rogers, *supra,* is the correct one, and that the evidence of experts in all cases should be received and weighed with caution.

4, 5. Taking that view of such testimony, we find that the evidence greatly preponderates in favor of the validity of the will. The evidence for the will is strong, and that tending to prove that the will is a forgery is weak.

The contestants claim that the officials of the abbey are estopped to claim that a will was executed by the fact that they represented to the contestant John B. Wendl and Mr. Conley that there was no will, but we think that there is nothing in this claim of estoppel. The authorities told them that the decedent had made over all his property to the abbey and that there was no will. The contestants did not believe that statement or act on it, as they petitioned the County Court for the appointment of an administrator and claimed that the deceased had property at the time of his death. If they had believed the statements made to them by the authorities of the abbey as a whole and had acted on it, they would not have applied for administration on the decedent's estate. There is no plea of estoppel in this case.

The fact that three officers of the abbey told the contestant John B. Wendl and Mr. Conley that the decedent left no will is a material fact to be considered in weighing the evidence of those persons, but it does not affect the evidence of the subscribing witnesses to the will or the evidence of several other witnesses who have given evidence tending to prove that the will was executed by the decedent. If the evidence of the persons who denied that the decedent left a will were eliminated from the case, there would still be sufficient evidence to prove that the will was duly executed.

We find that the document referred to in the pleadings as the will of the decedent was in all respects duly signed by the decedent Emmeran D. Wendl on the seventeenth day of November, 1910, in the presence of the two subscribing witnesses thereto and declared by him to be his last will and testament, and that said witnesses, in the presence of said decedent and in the presence of each other, at the request of the decedent, subscribed their names to said will as attesting witnesses thereto, and that the decedent was at the time that he executed said will of a sound and disposing mind and memory and free from undue influence and fraud, and that said instrument is his last will and testament.

We approve the findings and the decree of the court below and the order of the County Court of Marion County admitting said will to probate.

The decree of the court below is affirmed.

AFFIRMED: REHEARING DENIED.

MR. CHIEF JUSTICE MCBRIDE, MR. JUSTICE MOORE and MR. JUSTICE BURNETT, concur.